484 P.2d 235

In the Matter of ANONYMOUS, JUVENILE COURT NO. 6358–4, a minor.

No. 2 CA–CIV 974.

Court of Appeals of Arizona, Division 2.

April 28, 1971.

Rehearing Denied May 10, 1971.

Review Denied June 8, 1971.

Howard A. Kashman, Pima County Public Defender, Tucson, for Anonymous Minor.

Gary K. Nelson, Atty. Gen., Phoenix, Rose Silver, Pima County Atty. by Horton C. Weiss, Deputy County Atty., Tucson, for State of Arizona.

HOWARD, Judge.

This is an appeal pursuant to A.R.S. § 8–236 of the order of the Pima County Juvenile Court transferring a juvenile for prosecution and trial as an adult for arson and murder. On December 20, 1970, a tragic fire occurred at the Pioneer International Hotel in Tucson, Arizona. As a result of this fire 28 persons died either because of jumping from the windows to avoid the fire or from the fire itself. The juvenile who is the subject matter of this hearing was originally thought to be a witness to the setting of the fire, but after police questioning, was subsequently charged with arson and murder in a petition filed in the Juvenile Court. After a hearing, at which he was represented by the Public Defender, the court entered the transfer order of which the minor complains.

In attacking this order, the minor presents three questions, namely: (1) Did the court err in admitting into evidence statements made by him to the police? (2) Was the evidence sufficient to show probable cause? (3) Was there sufficient evidence upon which the court could find probable cause that he should not be treated as a juvenile?

The facts show that on December 19, 1970, at approximately 11:45 p. m., the minor was seen sitting in the mezzanine of the Pioneer Hotel by a person who was attending a dance for Hughes Aircraft employees in the Pioneer Ballroom. He came to the attention of the witness when he asked the witness for a cigarette. When

he asked the minor if he needed a match the minor indicated that he did not and held up a book of matches. Prior to this time, at approximately 5:00 p. m., the minor was seen on the street directly across from the hotel by one Frank Armenta, who had previously worked at the juvenile detention facility and was acquainted with the minor. They conversed and the minor told him that he was on his way to work as a busboy at the Pioneer Hotel. Subsequent witnesses stated that the minor did not work in any capacity at the Pioneer Hotel.

The night clerk at the hotel testified that at approximately 12:15 a. m. on December 20, 1970, he received a call from a woman on the third or fourth floor who stated that she smelled smoke. He then called Andy, the bellman, and told him there was a report of a fire. Shortly thereafter the switchboard lit up with calls from other guests in the hotel stating that there was a fire. About 20 minutes later Andy returned and told the clerk that the fire looked pretty bad and to call the fire department. The fire department was called and responded within five minutes.

David Johnson, the custodian at the hotel, testified that he was in the hotel lobby when he heard the night clerk tell Andy about the fire. At that time Mr. Johnson told another employee that they ought to go investigate. They went by elevator up to the third floor where they encountered smoke and the minor who was standing alongside the stairway leading up to the fourth floor where flames could be seen. The minor told Johnson to get a fire extinguisher. Johnson succeeded in partially. extinguishing the fire on the stairways before the fire extinguisher emptied. Johnson then went downstairs to get a Mr. Scoggins, the beverage manager at the hotel, in order to procure more fire extinguishers. Scoggins and Johnson obtained another extinguisher and went back to the third floor. There they again encountered the minor who was attempting to pull out a fire hose for use in extinguishing the fire.

Mr. Scoggins testified that while they were on the third floor the minor said: "I saw two colored boys with African hairdos and they were fighting and scuffling and they started the fire." Finally realizing they could not handle the fire, the two men and the minor left the area. According to Scoggins he saw the minor help carry a lady on a stretcher out of the hotel and also saw the minor wearing a white jacket, the type worn by employees of the Pioneer Hotel. The minor at one point took this jacket off and Mr. Scoggins kept it and brought it to the Juvenile Court hearing. Mr. Scoggins further testified that after the police came he informed them that there was a witness to the starting of the fire. The minor continued helping people in the hotel and while he was so engaged, Scoggins pointed him out to the police as the potential witness he had indicated.

Officer Adams of the Tucson Police Department stopped the minor, asked him his name and address and whether he would accompany him outside. The minor replied in the affirmative whereupon they proceeded out the front door of the hotel and walked approximately a block to Adams' unmarked car. Adams testified that as they approached the car the minor asked him if he should get in the back seat. Adams told him he did not need to since he was not under arrest and Adams saw no reason why he couldn't ride in the front seat. Adams got in on the driver's side of the automobile and the minor walked around to the front passenger side and entered the automobile. They then proceeded to the police station where they went into the little coffee room in the police station where the minor spoke to Officer Rossetti. Adams and the minor then went into the city council chambers, at which time, according to Adams, he merely considered the minor a potential witness and did not suspect that he had started the fire. Officer Adams asked the minor what had happened. The minor commenced telling him what had happened in a manner that was apparently consistent with what Mr. Scoggins had told Adams. But then he told

him, contrary to what Mr. Scoggins had reported to Adams, that the fire was started by a Mexican and a Caucasian. As soon as Adams heard this and realized that this differed from the testimony of Scoggins, he advised the minor of his rights. At this time it was approximately 3:30 a. m. When asked whether or not he wanted an attorney to be present during their questioning, the minor stated that he did not.

For approximately two hours he was questioned by at least three other detectives. After Adams had spoken to the minor he turned him over to Detective Gassaway. The minor told Gassaway that while he was trying to unkink the fire hose he saw two subjects, a Mexican male and a white male with long hair run from the area where the fire was. When Gassaway asked him whether or not he knew these persons the minor replied: "Well, I don't want to fink on anybody." He told Gassaway the reason he went to the hotel was to see a person named Mike Tatum. When Gassaway confronted him with the fact that Tatum hadn't worked at the Pioneer Hotel since june of 1968, he admitted he didn't know anybody named Tatum that worked at the Pioneer Hotel. When pressed by Gassaway, the minor also admitted that he had never seen anybody run from the area of the fire. Gassaway asked the minor where he had gotten the white coat and he replied that he had found it. When asked why he was wearing it, the minor said that he had put it on so that he could mingle with people and maybe steal drinks while he was with his friends around there. Gassaway then asked him to name some of the friends that he had seen and talked to and the minor then admitted that he didn't talk to anybody. He told Gassaway that he saw some people in the' area of the fire who he thought had no business there. He stated that three Caucasians and two Mexicans got off the elevator, started to the room where the liquor was kept; that there was a Negro lady outside who told them they had better stay out of that room and that there were po-

lice officers inside the room; that one of the subjects "looked real mean"; that this subject had a gun in the waistband of his pants and that he believed he started the fire. The minor denied starting the fire and kept saying: "I didn't kill those people."

Between 4:00 and 4:30 a. m., as Detective Angeley interviewed him, he first said he had been at the Pioneer looking for one of the Grisby boys and later said it was one of the Tatums. He told Angeley the fire started in the third and fourth floor areas and he had seen two Negro boys on the fourth floor. He later stated he had seen a Mexican boy with long hair who started the fire; that he had previously seen this boy around a pool hall on South Sixth Avenue; and that he was one that sold dope in Himmel Park but he did not know his name.

## ADMISSIBILITY OF STATEMENTS

■ Before discussing admissibility of the oral statements made by the minor to the police, it is apropos to discuss the nature of the transfer hearing. Although the case of Kent v. United States, 383 U.S. 541, 86 S.Ct. 1045, 16 L.Ed.2d 84 (1966), was based in part on the statutory law of the District of Columbia, the constitutional requirements set forth therein led the Supreme Court of this state to promulgate rules of procedure for the juvenile court. Rules 12, 13 and 14 of the Rules of Procedure for the Juvenile Court, 17 A.R.S. set forth the processes for transferring a minor to the adult court for criminal prosecution. Inspection of these rules leads us to the conclusion that like the two-phase adjudicatory and dispositional divisions of a juvenile hearing on a delinquency matter, the transfer hearing also can be divided into two phases: (1) Has an offense been committed and does probable cause exist to believe that the child committed the offense? and (2) if so, should the court retain jurisdiction or transfer the child to adult court? The second phase of the transfer hearing will be discussed later in

this opinion and we shall therefore confine ourselves at this point to the first phase.

■ This leads us to the question of how this phase should be conducted and what evidence is admissible. Kent v. United States, *supra, points out that the determination of whether to transfer a child from the statutory structure of the Juvenile Court to the criminal processes is critically important. Rule 14 of the Rules of Procedure of the Juvenile Court states that "* * * At the conclusion of the transfer hearing, the court shall determine whether an offense has been committed and that probable cause exists to believe that the child committed the offense alleged * * *." The use of the term "probable cause" leads us to conclude that the first phase of the transfer hearing has some comparability to a preliminary hearing in the adult court. This requires that the determination be founded upon competent evidence to the same extent as any other judicial proceeding. See State v. Jacobson, 106 Ariz. 129, 471 P.2d 1021 (1970). The Juvenile Court judge, therefore, has a duty to deny admission into evidence those statements of the juvenile that are inadmissible under the statutory or case law of this state.

In the instant proceedings, after both the state and the minor had submitted memoranda setting forth the reasons for or against the admissibility of the minor's statements, the Juvenile Court judge ruled, on the basis of the totality of circumstances, that all the statements made by the minor prior to the time he requested an attorney at the Juvenile Court Center were admissible. On appeal both parties urge to this court the same grounds that they presented in the Juvenile Court in support of their contentions.

The minor contends that the admissibility of the statements is governed by the case of State v. Maloney, 102 Ariz. 495, 433 P.2d 625 (1967) and further argues that A.R.S. § 8–221, though repealed, still applies. The state contends that since certain sections of the Juvenile Code have

been repealed, State v. Maloney, *supra,* no longer applies and that the test of admissibility of the statements is the "totality of circumstances" as epitomized in the case of People v. Lara, 67 Cal.2d 365, 62 Cal.Rptr. 586, 432 P.2d 202 (1967).

A.R.S. § 8–221, which has been repealed, read:

"A. A peace officer, other than the probation officer, who arrests a child under the age of eighteen years, shall forthwith notify the probation officer, and shall make such a disposition of the child as the probation officer directs."

We need not discuss the applicability of *Maloney* in view of the repeal of A.R.S. § 8–228 since, as will be seen, we find that the statements made by the minor to Rossetti and initially to Officer Adams, were not made when the minor was being subjected to custodial interrogation.

Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602, 16 L.Ed.2d 694, 10 A.L.R.3d 974 (1966), does not prevent the police from investigating crimes. The warning formula set forth in *Miranda* need only be given prior to custodial interrogation. Testimony elicited at the transfer hearing shows that when Officer Adams went with the juvenile down to the police station, the juvenile was not under arrest. Initially, he was a prospective witness. He rode in the front seat with the officer and was not cuffed. When he arrived at the police station and went into the coffee room, he was not guarded in any manner. To all outward appearances he was considered a witness as were a great many other persons who later came down to the police station that morning as prospective witnesses. In fact, the only evidence at that point in time that the fire was man-made was the minor's statement to Mr. Scoggins that he saw two Negro boys in Afro haircuts start the fire. While it is true that Scoggins suggested to Officer Adams that perhaps the minor himself started the fire, we believe it was nothing more than a gratuitous remark by one who had not seen the fire start. It did not make the minor a suspect,

nor did Officer Adams give any weight to Scoggins' statement.

▆ When Adams first brought the minor to the police station, they went into the coffee shop where Officer Rossetti was sitting. Rossetti had a conversation with Adams at that time. Adams told Rossetti that the boy had been at the fire at the Pioneer Hotel. He did not tell Rossetti that the boy was a suspect nor did Rossetti consider the boy to be a suspect. The conversation between Rossetti and the minor was precipitated when Officer Rossetti recognized him from a few years past. He spoke to the minor and asked his name and if he remembered him. He then asked him about the fire and what he was doing in the Pioneer Hotel. At that time the minor told him that he went there to meet a friend called Tatum who worked in the kitchen someplace. He told Rossetti that he got on the elevator and went up to the third floor where he got off. At first he told him that he saw two Negroes with Afro-type hairdos and later described these two individuals as being Mexican. After talking with Rossetti, the minor then went with Adams. It was only after Adams realized that the boy was making conflicting statements that he apprised him of his Miranda rights. It is our opinion that up to this time, there was no custodial interrogation and no reason to comply with *Miranda* and State v. Maloney, supra. We perceive of no law that forbids law enforcement officers from interviewing minor witnesses. State v. Shaw, 93 Ariz. 40, 378 P.2d 487. Law enforcement would be unduly hampered if we were to require that before law enforcement officers interview a minor witness they must contact his parents and give them and the minor the Miranda warning and further advise them of the possibility of transfer to adult court. All statements made by the minor to Rossetti and Adams up to the time Adams gave the minor the Miranda warning were properly admitted into evidence.

If the balance of the statements made by the minor were erroneously admitted into evidence at the probable cause hearing,

such fact would not vitiate that hearing unless the transfer was based entirely on incompetent evidence. Cf. McAllister v. Superior Court, 165 Cal.App.2d 297, 331 P.2d 654 (1958); Mitchell v. Superior Court, 50 Cal.2d 827, 330 P.2d 48 (1958); Rogers v. Superior Court, 46 Cal.2d 3, 291 P.2d 929 (1955). We therefore pursue the question of whether or not there was sufficient evidence to show probable cause apart from the statements made after the Miranda warning by Officer Adams.

## EVIDENCE OF PROBABLE CAUSE

▆ Since we have already drawn an analogy between that portion of the transfer hearing concerning the commission of a crime and a preliminary hearing in the adult court, we shall continue to draw upon the case law concerning preliminary examinations in order to determine whether or not there was in the case at bench probable cause to believe that a crime had been committed and that the minor had committed it. The purpose of a preliminary hearing is to determine whether evidence is sufficient to find probable cause to hold a person to answer for the offense charged. State v. Wise, 101 Ariz. 315, 419 P.2d 342 (1966). The preliminary examination is not a trial but simply a course or procedure whereby possible abuse of power may be prevented. State v. Schumacher, 97 Ariz. 354, 400 P.2d 584 (1965). It is not the duty of a committing magistrate to determine ultimate guilt or innocence of a defendant but only to determine whether there is probable cause to believe him guilty of the offense charged and leave to the trial tribunal the question of whether he is guilty of the offense charged. Application of Williams, 85 Ariz. 109, 333 P.2d 280 (1959). Mere suspicion that the defendant is guilty of the offense charged is not sufficient for a finding of probable cause to believe that the defendant committed the offense. State v. Abbott, 103 Ariz. 336, 442 P.2d 80 (1968). In order to arrive at a conclusion of probable cause there must be more evidence for, rather than against, guilt and there must exist

such a state of facts as would lead a man of ordinary caution to conscientiously entertain a *strong* suspicion of guilt. Dodd v. Boies, 88 Ariz. 401, 357 P.2d 144 (1960).

■ A person who willfully and maliciously sets fire to a building is guilty of arson, a felony. A.R.S. § 13–232. Murder is the unlawful killing of a human being with malice aforethought. A.R.S. § 13–451. A murder which is committed in the perpetration of arson is murder of the first degree, A.R.S. § 13–452, whether willful and premeditated or only accidental. People v. Chapman, 261 Cal.App.2d 149, 67 Cal.Rptr. 601 (1968), cf. State v. Akins, 94 Ariz. 263, 383 P.2d 180 (1963); State v. Serna, 69 Ariz. 181, 211 P.2d 455 (1949); 1 Wharton's Criminal Law § 251 at 539.

■ Two expert witnesses testified that the fire was man-made and deliberately set in two different places on the fourth floor. The only complaint that the minor has concerning the evidence of the crimes is that it fails to show any connection between himself and the setting of the fires. We do not agree. The minor was first seen at 5:00 p. m. across from the hotel by Armenta. He told Armenta that he was going to the hotel and that he worked there as a busboy. This was a falsehood. He was next seen on the mezzanine about an hour before the fire. It is significant that he never gave a reason for being there. He next mysteriously appeared on the third floor at the staircase where the flames were visible. This floor contains only rooms for guests as opposed to the mezzanine which has several banquet rooms. At times he was seen dressed in a white jacket similar to those used by busboys in the hotel. He claimed to have seen how the fire started, but gave contradictory statements. After the fire was extinguished, an experiment was run to determine its origin. It showed that a person could have started the fire by opening a matchbook, lighting all the matches and setting the book on the carpet with the matches facing against the carpet. When ultimately searched, the minor was in possession of five books of matches. All of the foregoing is enough to satisfy the probable cause requirements as set forth in Dodd v. Boies, supra.

## PROBABLE CAUSE THAT A MINOR SHOULD NO LONGER BE TREATED AS A JUVENILE

As we have previously indicated, the second stage of the transfer hearing is akin to the dispositional phase of a regular Juvenile Court delinquency hearing. Since the case of Application of Gault, 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967) concerned only the due process requirements of the adjudicatory stage, we believe that the second phase of the transfer hearing need not conform to the same procedural requirements of the phase involving the question of whether a crime has been committed and there is probable cause that the juvenile committed it.

Rule 14 of the Rules of Procedure for the Juvenile Court, subsection (b), states that in order for the court to transfer the action to the adult court for criminal prosecution the court must find probable cause and have reasonable grounds to believe that:

"* * * (1) The child is not amenable to treatment or rehabilitation as a delinquent child through available facilities; and

(2) The child is not committable to an institution for mentally deficient, mentally defective or mentally ill persons; and

(3) The safety or interest of the public requires that the child be transferred for criminal prosecution * * *."

Subsection (c) of the foregoing rule further states that upon transfer the Juvenile Court "* * * shall state the reasons therefor by minute entry or written order * * *."

The initial transfer order which we received in this case was defective in that the Juvenile Court merely set forth the conclusory grounds contained in subsection (b) of the Rule and did not state reasons

for such conclusions. We therefore suspended the appeal and reinstated the jurisdiction of the Juvenile Court for the limited purpose of preparation of an order in accordance with Rule 14. Cf. Yoo Thun Lim v. Crespin, 100 Ariz. 80, 411 P.2d 809 (1966); Eaton Fruit Company v. California Spray-Chemical Corp., 102 Ariz. 129, 426 P.2d 397 (1967). We now turn our attention to the facts which the court considered in deciding whether or not the minor should be transferred to the adult court. On the issue of whether or not the child was committable to an institution for mentally deficient, defective or mentally ill persons, the court considered a psychological evaluation done by Dr. Lewis Hertz. This evaluation indicated that the minor was functioning at a borderline level of intelligence, but that his potential was estimated to be in the low average range. The conclusion of Dr. Hertz was:

\* \* \*

"[The minor] is of low average intellectual potential. Current functioning is borderline with common sense and interpersonal skills being much like those of a twelve-year-old and representing a retardation of over four years in these functions. There is a long history of deviant behavior which has led to several incarcerations. There appears to be a penchant for antagonizing other people. Behavior has often been inordinately primitive. Sociopathic features are firmly entranched. Resentment is in abundance. [He] avoids issues. Foresight is lacking. He is highly uncertain and insecure. He is prone to take impulsive action to relieve tension and is likely to be oblivious to the consequences of his behavior.

There is no indication of current gross ideational distortion. [He] is not psychotic. He is able to assist counsel in his defense. The impression of antisocial personality (sociopathy) given by the state hospital is considered valid. Unless there is any appreciable modification of his behavior, [he] is extremely likely to continue to act out in a deviant

manner and will continue to be incarcerated."

Dr. Robert I. Cutts, psychiatrist, made a report to the court which stated in part:

"He is without disturbances of orientation or memory. His attention is easily gained and held and he has no feelings of remorse or guilt. General knowledge is limited and, clinically, his intelligence appears to be within the dull normal range but this has not interfered with his being very crafty and manipulative. He repeatedly uses very poor judgment. This is particularly apparent as he feels that, magically, at the time when he becomes eighteen, he will no longer be in trouble with the law. I attempted to clarify his reasoning concerning age eighteen as being the end of his status as a juvenile offender. During the close of the interview, the subject was presented with a number of questions in an attempt to elicit a possible connection with the offense which you are investigating. I could find nothing that indicated his involvement.

In summary, I would say that this boy is a hard core delinquent, who has had many opportunities for rehabilitation and has profited by none of them."

Dr. Allan Beigel, chief of the neuropsychiatric unit at the Pima County General Hospital, reported to the court on January 5, 1971 that he had examined the minor and as a result of this examination he did not feel that he was in need of psychiatric hospitalization. Dr. Beigel classified the minor as suffering from a character disorder, primarily sociopathic personality.

The social file of the minor indicated a history of epileptic-type seizures while in confinement. However, medical examination, psychiatric interviews and a glucose tolerance test given at the County Hospital indicated no basis for such seizures and, in fact, the minor admitted to one psychiatrist that the seizures "were staged." Also before the judge was a report from the Arizona State Hospital pursuant to an examination made on November 11, 1970. The

hospitalization was precipitated by alleged seizures which occurred while the minor was at Fort Grant Industrial School for Boys. The diagnosis and report, among other things, stated:

\* \* \*

"The patient is clean, well dressed and groomed. He appears to be about the stated age of 16 years. His posture is quite appropriate and he seems to be well coordinated. His facial expressions as well as his manner and attitude convey very little feelings. His mood is bland. His affect is inappropriately flattened in that there are no affectual changes regardless of the topic of conversation. His affect remains the same whether we are talking about Fort Grant, his stealing and his alleged seizure disorder or a TV program. His psychomotor activities are within normal limits. His attention span is quite adequate. He is not irritable or distractable. He speaks in a normal tone of voice, with normal voice modulation. During my first 4–5 sessions with him he offered very little conversation, however, gradually he began to talk and talked very freely about himself and his life. He has no friends and does not feel that he needs friends. He seems to be incapable of forming human relationships, with the possible exception of his twin sister, whom he does seem to have some feelings for. He seems to be devoid of any feelings for his parents, he simple [sic] regards them as possible sources of material things. He feels no guilt about his delinquent acts, he only expresses anger at the 'pigs' who caught him. He does not seem to be capable of accepting the responsibility for his own actions, but constantly projects this unto others or circumstances. There is no indication of psychosis. His thought processes are logical, clear, relevant and coherent. He consistently reaches his goals in thinking. The content of his thoughts is focused on 'when do I get out of this joint.' He is well oriented as to time, place and person. His memory both for remote and recent events is excellent."

He was then diagnosed as an antisocial personality and given a complete discharge from the hospital.

The transfer investigation by the Juvenile Probation Department showed that the minor had a long history of delinquent behavior beginning at age eleven. The referrals included such offenses as larceny, burglary, and strong armed robbery. He was committed to Fort Grant Industrial School for Boys four times. The report of the probation department further indicated that the minor's lack of response to treatment under the aegis of the Juvenile Court and Department of Corrections was probably due to the fact there was an initial medical misdiagnosis of epilepsy. The report opines that although he is a sociopath, had the authorities at Fort Grant known that he was not epileptic, an effort could have been made to develop in him an acceptable pattern of behavior which would have prevented continued law violations. However, the report further indicated that the pattern of misconduct in the minor was so deeply ingrained that he was not amenable to treatment or rehabilitation as a delinquent child through the facilities available to the Juvenile Court. In coming to this recommendation the probation department not only looked to the facilities that were available in the State of Arizona but also checked with facilities in Kansas, Washington, Texas and California and found no institution which would suit the needs of the minor.

The court also had before it a report from Allan Cook, director of the Arizona State Department of Corrections. An evaluation of the minor's case was made by the staffing committee of the Department of Corrections and it concluded that there were no juvenile facilities either outside or in the State of Arizona which could facilitate treatment of the minor.

■ Contrary to the contentions of the minor on appeal, the record shows that the minor had a full and complete hearing on

both phases of the transfer hearing. His past record and the present charges do indeed indicate that he is a menace to society and apparently has not profited at all under the protection of the juvenile system. There comes a time when a minor's welcome in Juvenile Court is worn out and he must understand that if he continually refuses to be receptive to treatment under the juvenile system and continues to be an irresponsible person, the only alternative left for the Juvenile Court is to transfer him to the adult court for criminal prosecution.

This minor has had too many bites from the apple and the court was well justified in ordering a transfer.

Affirmed.

KRUCKER, C. J., and HATHAWAY, J., concur.