754 P.2d 1356

**In the Matter of the APPEAL IN COCONINO COUNTY JUVENILE ACTION NO. J–10359.**

**No. 1 CA–JUV 385.**

Court of Appeals of Arizona, Division 1, Department C.

Dec. 31, 1987.

Review Denied June 21, 1988.

Allen, Kimerer & LaVelle by Michael D. Kimerer, Garth V. Smith, Suzanne Ticknor, Phoenix, for appellant.

John Verkamp, Coconino Co. Atty. by Jon W. Thompson, Deputy Co. Atty., Flagstaff, for appellee.

## OPINION

GRANT, Judge.

In this appeal from an order of the juvenile court transferring the juvenile to adult court for prosecution pursuant to Rule 14, Rules of Procedure for Juvenile Court, two issues are presented for our consideration: (1) was the transfer order contrary to law; and (2) did the trial court abuse its discretion? We affirm the order of transfer.

## FACTS

The juvenile, aged 16, three other teenagers, and a group counselor were touring the National Parks in the western states during the summer of 1986. The group spent the night of August 12 in Flagstaff, intending to visit the Grand Canyon the following day. At approximately 7:45 a.m., the morning of August 13, the body of 16-year-old Eric Kane was discovered in the motel room which he had shared with the juvenile the previous night. The juvenile, however, was gone, as were the group's rented car and $3,000 worth of traveler's checks.

The evening before Eric's body was discovered, the group ate pizza, and afterward the juvenile and Eric went to a movie. After returning to the motel, the juvenile asked the counselor for the car keys, saying that he wanted to listen to music. The counselor did not hear any music from the car but observed the juvenile sitting in the car looking at a road map.

The morning of the 13th, the counselor, finding the door to the room shared by the juvenile and the victim ajar, saw the blood-soaked bed and called the police. Police discovered the victim's body in the bathroom. The victim had bled to death as the result of two stab wounds. Between the two beds, police discovered the juvenile's "survival" knife, which he had purchased only days before. Later test results revealed the victim's blood and the juvenile's fingerprints on the knife.

On August 21, a week after the murder, his funds exhausted, the juvenile, accompanied by his parents and attorney, surrendered to the Flagstaff authorities. Following a detention hearing, the juvenile was released to his parents and the family returned to Massachusetts. In Massachusetts, the juvenile was hospitalized and extensively tested by mental health authorities. From the hospital, the juvenile telephoned a Flagstaff police detective and made a confession regarding the murder of Eric.

A petition was filed with the juvenile court charging the juvenile with one count of first degree murder and one count of theft. The county attorney requested that the juvenile court waive jurisdiction and order the juvenile transferred to adult court for prosecution. The juvenile court, on January 15 and 16, 1987, held a bifurcated hearing pursuant to rule 14.

RULE 14

The juvenile court must make two separate determinations in a transfer hearing:

(1) whether there is probable cause to believe that the offenses were committed and whether they were committed by the juvenile, and

(2) whether the juvenile should be transferred to adult court for prosecution.

Rule 14(a) and (b), Rules of Procedure for the Juvenile Court. In making the latter determination, rule 14 requires the juvenile court to consider the following factors:

(1) the seriousness of the alleged offense and whether it was committed in an aggressive, violent, premeditated or willful manner;

(2) whether the alleged offense was against person or against property, and whether personal injury resulted;

(3) the sophistication and maturity of the child as determined by consideration of the child's age, intelligence, education, environment, emotional attitude and pattern of living;

(4) the child's physical, mental and emotional condition;

(5) the record and previous history of the child, including previous contacts with juvenile courts and law enforcement agencies in this and other jurisdictions, prior periods of probation in any court and their results, and any prior commitments to juvenile residential placements and secure institutions;

(6) whether the child has previously been transferred for criminal prosecution in this or any other state;

(7) the prospects for adequate protection of the public and the likelihood of reasonable rehabilitation of the child by the use of services and facilities currently available to juvenile court; and

(8) any other factors which appear to be relevant to the determination of the transfer issue.

Rule 14(c), Rules of Procedure for the Juvenile Court.

■ The primary focus of rule 14 is the protection of the public. *Juvenile Appeal J–96695*, 146 Ariz. 238, 705 P.2d 478 (App.

1985). Once the juvenile court has found probable cause, rule 14 requires that the court "determine whether the public safety or interest would best be served by the transfer of the child for criminal prosecution." Rule 14(c), Rules of Procedure for the Juvenile Court.

While the public interest is paramount, the best interests of the child must also be taken into account. *See Juvenile Appeal J–9896*, 150 Ariz. 435, 724 P.2d 54 (App. 1986), *vacated Juvenile Appeal J–9896*, 154 Ariz. 240, 741 P.2d 1218 (1987). Rule 14 specifically includes as one factor for consideration the child's amenability to treatment as a juvenile. However, rule 14 also couples that consideration with a determination of "the prospects for adequate protection of the public." Rule 14(c)(7), Rules of Procedure for the Juvenile Court. There is one additional safeguard relating to the child rather than the public. Rule 12 requires that "[t]he court shall not transfer a child for criminal prosecution who is committable to an institution for mentally deficient, mentally defective or mentally ill persons." Rule 12(d), Rules of Procedure for the Juvenile Court. A finding of "committability" under rule 12 thus precludes transfer of a juvenile to adult court for prosecution.

*The Rule 12 Determination*

Before making its probable cause and transfer determination, the juvenile court conducted a hearing to determine whether this juvenile satisfied the criteria for committability. The court determined that the commitment standard was not met and therefore the juvenile was not committable pursuant to rule 12.

■ Rule 12 does not contain guidelines for making commitment determinations. *See State ex rel. Dandoy v. Superior Court*, 127 Ariz. 184, 619 P.2d 12 (1980) (relating to competency). Accordingly, the juvenile argues that Arizona has two distinct and separate statutory schemes for commitment to a mental health facility: (1) A.R.S. § 8–242.01, applicable to children, and (2) A.R.S. § 36–540, applicable to

adults. Arizona Revised Statutes § 8–242.01 provides in pertinent part:

A. If evidence indicates that a child who is a ward of the court or in custody pursuant to this title may be suffering from a mental disorder or other personality disorder or emotional condition, the juvenile court may order an evaluation or case assessment on an outpatient basis in order that the child's psychological, mental or developmental condition may be considered in case planning.

B. Whenever evidence indicates that there is reasonable cause to believe that a child who is in custody of the juvenile court or the department of corrections, or who has been adjudicated a delinquent or incorrigible child and is awaiting final disposition pursuant to § 8–241 and is placed in the physical custody of someone other than the child's natural or adoptive parent, or who is on probation or parole as a ward of the juvenile court or department of corrections and is placed in the physical custody of someone other than the child's natural or adoptive parent, or who is a ward of the juvenile court as a dependent child committed to the department of economic security, meets the standard for inpatient evaluation or treatment set forth in § 36–518, subsection C the court may approve the child's admission to a mental health agency for inpatient evaluation or treatment. The child's probation officer, parole officer, caseworker or attorney may file an application for the admission of the child to a mental health agency for inpatient evaluation or treatment. The probation officer, parole officer, caseworker or attorney shall notify the juvenile court on the same or next succeeding court day that an application has been made and petition the court for approval of the admission. The court shall appoint counsel for the juvenile if not already represented by counsel. An attorney appointed to represent a child pursuant to this subsection shall be subject to the provisions of § 36–537, subsection B. The court may also appoint a guardian ad litem. Except in the case of an emergency admission, no child shall be admitted for inpatient evaluation or treatment pursuant to this subsection unless the admission is approved by the juvenile court. An inpatient evaluation shall be limited to seventy-two hours, excluding weekends and holidays.

A.R.S. § 8–242.01(A) and (B).

The juvenile contends that A.R.S. § 8–242.01 allows for inpatient treatment of children with or without their consent. We do not disagree with that interpretation. However, the juvenile further contends that A.R.S. § 8–242.01 is the Arizona standard for committability of juveniles as "committability" is used in rule 12. With this we disagree.

By its own language A.R.S. § 8–242.01 explicitly limits its applicability to a juvenile who is in the legal custody of the juvenile court or the department of corrections and who is not in the physical care, custody, and control of his parents. A.R.S. § 8–242.01(B). In other words, the juvenile court must stand *in loco parentis* in those listed situations. However, when the juvenile is in the physical care of his parents, his nonconsensual admission is governed by A.R.S. § 36–518. After the mental health agency performs certain screening procedures, this provision provides that "[a] minor may be admitted to a mental health agency ... by the written application of his parent, guardian or custodian of the minor...." A.R.S. § 36–518(C).

We note that nothing in the Rules of Procedure for the Juvenile Court would prevent the county attorney from initiating a rule 12 transfer proceeding while a juvenile is not "in the physical custody of someone other than [his] natural or adoptive parent." In such a case, A.R.S. § 8–242.01 as noted above, does not apply. Were we to give A.R.S. § 8–242.01 the interpretation the juvenile urges, then by implication the applicable standard in this second situation is A.R.S. § 36–518, and any parent could prevent a rule 14 transfer to adult court simply by voluntarily admitting the child to a mental health agency. Similarly, the medical director of the mental health institution could likewise thwart the transfer proceeding. *See* A.R.S. § 8–242.01(C)(1).

Such a result would be incongruous with the goal of public protection. Public protection has always been the justification for transfer of a juvenile for trial as an adult, and the court has the duty of balancing the interests of the juvenile with the safety of the public. *See Matter of Seven Minors*, 99 Nev. 947, 664 P.2d 947 (1983); *Commonwealth v. Sourbeer*, 422 A.2d 116 (Pa.1980).

Because rule 12 does not provide for a separate commitment standard and A.R.S. § 8–242.01 has limited applicability, we hold that A.R.S. § 8–242.01 pertains to "voluntary" admission under court supervision for evaluation and treatment and does not satisfy the term "commitment" for the purpose of rule 12(d) and rule 14.

Next, we address whether the juvenile is committable under A.R.S. § 36–540. This statute allows court-ordered treatment only if the proposed patient is (1) a danger to himself or others as a result of a mental disorder, (2) in need of treatment, and (3) either unwilling or unable to accept voluntary treatment. A.R.S. § 36–540(A).

Here, because we have already held that transfer cannot be thwarted by voluntary commitment, we assume that the juvenile was "unable to accept voluntary treatment" within the meaning of the foregoing statute. Title 36, by statutory definition, gives courts guidelines for making commitment determinations:

> "Danger to others" means that the judgment of a person who has a mental disorder is so impaired that he is unable to understand his need for treatment and as a result of his mental disorder his continued behavior can reasonably be expected, on the basis of competent medical opinion, to result in serious physical harm.

A.R.S. § 36–501(5). The statute distinguishes "mental disorder" from character or personality disorder. " 'Mental disorder' means a substantial disorder of the person's emotional processes, thought, cognition or memory. Mental disorder is distinguished from ... character and personality disorders characterized by lifelong and deeply ingrained antisocial behavior patterns, including sexual behaviors which are abnormal and prohibited by statute unless the behavior results from mental disorder." A.R.S. § 36–501(20)(c). Thus the statute itself specifically precludes courts from committing people diagnosed as suffering from a character or personality disorder unless such a disorder results from a "mental disorder" under A.R.S. § 36–501(20)(c).

Arizona appellate courts have consistently agreed and excluded character and personality disorders from the definition of "mental disorder" in rule 12 committability determinations. *Juvenile Appeal J–96430*, 142 Ariz. 515, 690 P.2d 816 (1984) (juvenile murderer with "serious conduct disorder" transferred); *Juvenile Appeal J–98065*, 141 Ariz. 404, 687 P.2d 412 (1984) (juvenile thief with a conduct disorder transferred); *Juvenile Appeal J–96695*, 146 Ariz. 238, 705 P.2d 478 (App.1985) (fifteen-year-old murderer with deep psychological and emotional problems transferred); *In re Anonymous*, 14 Ariz.App. 466, 484 P.2d 235 (1971) (sixteen-year-old arson-murderer with character and personality disorder transferred).

The juvenile argues that the evidence was not sufficient for the juvenile court judge to find that he was not committable. In support of this argument, the juvenile states that "[a]ll mental health experts ... agreed that the juvenile suffers from one or more mental disorders." He adds that, except for the state psychologists, all the mental health experts "unequivocally" agreed that the juvenile was committable to an institution for the "mentally deficient, mentally defective or mentally ill persons."

The juvenile exaggerates the record. The juvenile court had the benefit of testimony by four mental health experts: three child psychologists, Dr. Michael Bayless, Dr. Daniel Cady, and Dr. Jeffrey Harrison, and one psychiatrist, Dr. Larry Strasburger. The court also had the benefit of two written reports submitted by Dr. Otto Bendheim and Dr. Kenneth Ash. While it is true that all mental health experts agreed on the seriousness of the juvenile's illness, it is also true that they did not concur on a specific diagnosis. Such lack of consensus is not unusual. *See generally* Aber and

Reppucci, *The Limits of Mental Health Expertise in Juvenile & Family Law*, 10 Int'l J. of Law & Psychiatry 167 (1987).

The mental health witnesses testified and submitted reports indicating that the juvenile suffered from a variety of disorders. They also testified that the juvenile's illness required intensive, long-term inpatient treatment. However, those experts who viewed the juvenile as committable appeared to base their decision on the seriousness of the juvenile's illness rather than on the statutory requirements. As serious as a juvenile's condition may be, it may not be of a type to warrant a particular procedural outcome. *Commonwealth v. Sourbeer*, 422 A.2d 116.

Dr. Bayless diagnosed the juvenile as schizotypal, which is a a personality disorder. Dr. Bayless further testified that a diagnosis of a mental illness was sufficient for commitment. Dr. Strasburger testified that the juvenile suffered from an "atypical conduct disorder" and was therefore committable. He further characterized acts of the juvenile as "antisocial behavior." In his report to the court, Dr. Bendheim diagnosed the juvenile as suffering from atypical conduct disorder and schizoid personality disorder. He noted that "in view of the seriousness of his conduct disorder, he is, in my view committable to a psychiatric institution." Dr. Cady viewed the juvenile as having a borderline personality disorder. Finally, Dr. Jeffrey Harrison testified that the juvenile's history of varied and repeated misconduct indicated a conduct disorder. He added that if the behavior persisted into adulthood, the juvenile would be diagnosed as an anti-social personality.

While the court heard conflicting testimony regarding whether the juvenile was committable, we note that only three of the six mental health experts practice in Arizona and would therefore have working familiarity with the Arizona commitment statute. Of the three Arizona doctors, only one, Dr. Bayless, maintained his belief that the juvenile was committable. Relying on his own experience with children committed to the Arizona State Hospital, Dr. Cady testified that although he believed inpatient treatment was necessary, "I am not sure whether he is committable." To reach this conclusion Dr. Cady compared the juvenile's high performance levels in sports and academics with the "typically disorganized, disintegrated personalities" of children that courts usually commit to the state hospital. Finally, Dr. Harrison unequivocally stated that the juvenile was not committable because he does not suffer from a mental disorder cognizable under Arizona statutes and does not present an imminent danger to others.

Dr. Harrison explained:

[i]f [the juvenile] indeed has a personality disorder, that is precluded by statute. If he does not have any other mental illness, then there is no other means. If he does have a mental illness, it would then need to be of a type where there is immediate danger to self or others, and although I do believe that because of his untreated condition he may—he poses possible risk to others and certainly there is behavioral support of that position because of his past actions. At this time there is not immediate danger.... [i]t is extremely difficult to commit a person involuntarily in this state.

The burden of proof on the issue of rule 12 committability rests not with the state, but with the juvenile. *Juvenile Appeal J–35834–1*, 20 Ariz.App. 10, 14, 509 P.2d 1047, 1051 (1973).

Here the trial judge held that the juvenile did not sustain his burden. Sufficient evidence existed for the court to conclude that the juvenile was not committable under rule 12 and rule 14.

*Juvenile Court Jurisdiction*

■ The juvenile argues that the juvenile court abused its discretion when it failed to consider a secure treatment plan available in the State of Massachusetts. At the transfer hearing, all of the mental health experts testified that the juvenile was probably amenable to treatment. The experts estimated that treatment would take anywhere from two to five years. Tentative arrangements for such a treatment plan were made in Massachusetts, the state where the juvenile's parents reside.

At the transfer hearing, the juvenile argued that Massachusetts, unlike Arizona, would not lose jurisdiction once the juvenile reached the age of eighteen. If a juvenile is still dangerous to the public when he reaches the age of eighteen, Massachusetts law allows its department of corrections to petition the Massachusetts court to extend a juvenile's commitment for two-year intervals.

Whether Massachusetts can retain jurisdiction over this juvenile after he reaches the age of eighteen is not the proper inquiry. Massachusetts' jurisdiction over this juvenile is derivative, based solely on the jurisdiction of Arizona. The Interstate Compact for Juveniles allows one state (the "receiving state") to offer courtesy placement for juveniles from another state (the "sending state"). A.R.S. § 8–361 art. X. However, the "sending state" at all times retains jurisdiction over delinquent juveniles sent to institutions of other states. *Id.* Therefore, the issue is not whether Massachusetts can extend its jurisdiction past eighteen, but rather whether Arizona can make such an extension.

The Arizona juvenile court's jurisdiction ends at age eighteen. A.R.S. § 8–246; *Juvenile Appeal J–70107–2*, 149 Ariz. 35, 716 P.2d 404 (1986). The Supreme Court of Arizona has declared that the Arizona Constitution, art. VI, § 15 precludes juvenile court jurisdiction over adults since "[an] extension of jurisdiction beyond age 18 results in a classification which discriminates between adults." *Juvenile Appeal J–86509*, 124 Ariz. 377, 379, 604 P.2d 641, 643 (1979). The Massachusetts plan is not a legally viable alternative. Therefore, the juvenile court did not abuse its discretion by refusing to accept it.

## SUFFICIENCY OF THE JUVENILE COURT'S FINDINGS

■ In a transfer proceeding due process requires that the juvenile court state its reasons when it orders a transfer. *Kent v. United States*, 383 U.S. 541, 561, 86 S.Ct. 1045, 1057, 16 L.Ed.2d 84, 87 (1966). The juvenile court made a series of findings at the transfer hearing including:

1. The crime that was allegedly committed by the juvenile is violent murder. There are facts which would indicate that it was committed in an aggressive, violent, premeditated and willful manner;

2. It is obvious that great personal injury resulted; to-wit, the death of the victim;

3. The juvenile is immature, but his intelligence, education, environment, and pattern of living are indicative of one who is advanced for his age. He is emotionally immature but not so immature that he could not understand the seriousness of his acts and that his acts would result in the death of the victim;

4. The child would appear to be in good physical health and emotionally stable. He does appear to suffer from a mental defect, but it would not appear that he is committable to an institution for mentally deficient, mentally defective or mentally ill persons;

5. The juvenile has no major prior contacts with the law. He has, however, been proud and has boasted of the fact that he was able to shoplift on a regular basis without detection. On one other occasion, he stole the family vehicle and ran away from home;

6. The child has never been transferred to be prosecuted by this State or by any other State to be prosecuted as an adult;

7. The Court cannot find that there is a likelihood of rehabilitation of the child by the use of services and facilities currently available to the Court. There is a likelihood that the juvenile can be rehabilitated but [it] is highly unlikely that it will occur within one year. It is further unlikely that it will occur within the next four years. The juvenile will turn 18 on February 13, 1988. The Court has been presented with a plan whereby the juvenile can be transferred to the State of Massachusetts where the authorities will hold him until he is 18. At that time, the State of Arizona loses jurisdiction. The State of Massachusetts has presented to the Court that they can retain jurisdiction over the juvenile upon a State Court

issuing the proper orders until the child can safely re-enter society. However, the Courts of the State of Arizona would have lost all jurisdiction. The Court cannot find that this adequately protects the people of this State or of any other State.

The juvenile challenges the findings, contending that the court abused its discretion. We will not overturn a transfer order absent a clear abuse of discretion. *Juvenile Appeal J–9896*, 154 Ariz. at 243, 741 P.2d at 1221; *Juvenile Appeal J–17047*, 138 Ariz. 287, 290, 674 P.2d 841, 844 (1983). The court is accorded this discretion because, in an unbiased manner, it observes the demeanor of the witnesses and the participants. *Juvenile Appeal J–17047*, 138 Ariz. at 290, 674 P.2d at 844.

■ The juvenile first argues that the court erred in finding probable cause that the juvenile committed premeditated murder. We disagree. Probable cause is a reasonable belief that a crime has been committed and that the accused committed it. *Juvenile Appeal J–84984*, 138 Ariz. 282, 284, 674 P.2d 836, 838 (1983); *Collins v. Superior Court*, 132 Ariz. 479, 647 P.2d 177 (1982). A person commits premeditated murder if he kills someone "intending or knowing that his conduct will cause death." A.R.S. § 13–1105(A)(1). Premeditation may occur as instantaneously as successive thoughts. *State v. Neal*, 143 Ariz. 93, 692 P.2d 272 (1984).

■ In this case, the evidence sufficiently supported the juvenile court's finding of probable cause. The juvenile's own confession describes a course of action with sufficient time for reflection. "I put on my clothes and, I saw the knife, and I saw Eric, and I picked up the knife and stabbed him twice." This was not necessarily a random, indiscriminate attack, demonstrating passion. The court heard other evidence that would support a finding of premeditation. The juvenile obtained the car keys and reviewed a road map only hours prior to the murder, and he purchased the murder weapon only days before the attack.

■ The juvenile also argues that the juvenile court erred in its finding regarding some of the factors listed in rule 14(c). First, the juvenile contests the finding that although emotionally immature, he was mature in intelligence, education, environment and pattern of living. While most of the mental health experts testified that the juvenile was "emotionally immature," they also testified that he was mature in some areas. The juvenile court judge is given wide discretion in resolving conflicts in testimony, *Juvenile Appeal J–98065*, 141 Ariz. 404, 407, 687 P.2d 412, 415 (App.1984), and here there was ample support for the court's finding regarding maturity.

■ The juvenile claims the juvenile court also erred in its finding that there was no likelihood of rehabilitation through the juvenile court. While it is true that all the mental health experts testified that the juvenile was amenable to treatment, they also indicated that such treatment would take several years. It must also be remembered that this rehabilitation factor does not stand alone. It is coupled with the "prospects for adequate protection of the public." Rule 14(c)(7), Rules of Procedure for the Juvenile Court. We have already found that Arizona would lose its jurisdiction over the juvenile at age eighteen, thus leaving the public unprotected.

■ Finally, the juvenile argues that the juvenile court erred when it found "that the public safety and the interests of the public would be best served by the transfer." The juvenile contends that choosing an undetermined number of years of incarceration in the Arizona prison system over a treatment plan that all mental experts agree is needed and to which the juvenile is amenable does not comport with the "public's safety and interest."

The juvenile court should inform itself "as to all aspects of the behavioral sciences as they specifically apply to the juvenile." *Juvenile Appeal J–72804*, 18 Ariz.App. 560, 563, 504 P.2d 501, 504 (1972). Testimony that attempts to predict human behavior over a definite period of time has limited usefulness. *Id.;* Aber and Reppucci, *The Limits of Mental Health Expertise*

*in Juvenile & Family Law,* 10 Int'l J. of Law & Psychiatry 167 (1987). Thus, the juvenile court is not bound by psychological recommendations. The juvenile court is not required to accept expert testimony. *Juvenile Appeal J-9896,* 154 Ariz. 240, 741 P.2d 1218 (1987). Here, the juvenile court judge relied on objective evidence: the commission of an aggressive, premeditated and violent act which resulted in a death, and the fact that Arizona would lose jurisdiction long before the juvenile might be rehabilitated. Therefore, the juvenile court did not err when it found the public safety and interest required transfer to adult court.

For the foregoing reasons, the transfer order is affirmed.

SHELLEY, P.J., and KLEINSCHMIDT, J., concur.