537 P.2d 938
**STATE of Arizona, Appellee and Cross-Appellant,**

v.

**Louis C. TAYLOR, Appellant and Cross-Appellee.**

**No. 2500.**

Supreme Court of Arizona, En Banc.

July 8, 1975.

Gary K. Nelson, former Atty. Gen., Bruce E. Babbitt, Atty. Gen., Phoenix, Dennis W. DeConcini, Pima County Atty., by Horton C. Weiss, Special Deputy County Atty., Tucson, for appellee/cross-appellant.

Howard A. Kashman, Tucson, for appellant/cross-appellee.

HAYS, Justice,

Louis C. Taylor, a minor, was convicted of twenty-eight counts of first degree murder in violation of A.R.S. §§ 13–451, 13–452 and 13–453 and sentenced on each count to life imprisonment. From the convictions and sentences he appeals.

The voluminous transcript accumulated through the various stages of this prosecution relates in detail the horrifying sequence of events which transpired at the Pioneer International Hotel in Tucson the evening of December 19 and morning of December 20, 1970, and which resulted in the deaths of twenty-eight persons and injury to many others. The Pioneer Hotel, a Tucson landmark since 1932, was packed with 111 guests plus several unregistered children and private nurses. The guests, many of them Mexican nationals in Tucson to do Christmas shopping, occupied sixty-six rooms on floors three through eleven, while an additional three hundred to five hundred employees of Hughes Aircraft Corporation attended a Christmas dance in the International Ballroom on the mezzanine (second floor) level.

Any attempt at summarizing the facts is aggravated not only by the enormity of the record, which includes over ten thousand pages of transcript, but also by conflicting testimony caused by the inability of numerous witnesses accurately to recall the exact time and order of events during the few hectic hours at issue in this case. This lat-

ter complicating factor is reflected in the testimony of several key witnesses, most of whom testified on several occasions as this case worked its way through a detention hearing, transfer hearing, preliminary hearing, pretrial motions, trial, and new trial hearing. Several witnesses testified more than once at the same hearing. In addition, the appellant's rendition of his activity that night and the manner in which he was handled by the police is in conflict with the testimony of the various police officers and others with whom he came in contact.

Our analysis of the record produces the following chronicle: As Frank Armenta, a former employee of the Pima County Juvenile Court Center, passed the intersection of Church and Alameda in downtown Tucson around 5:00 p. m. on December 19, 1970, he swung his car around upon seeing Louis Taylor, a former inmate at the Juvenile Center. A ten- to fifteen-minute conversation ensued during which the defendant declined a lift from Armenta, explaining he was on his way to the Pioneer where he was working as a busboy. Instead of proceeding to the hotel, however, Taylor went to several residences in search of a friend, eventually winding up with other friends at the Esquire Bar around 8:00 p. m. From there he went next door to a pool hall, then to the nearby Manhattan Bar, back to the pool hall, over to the Greyhound Bus Depot, back to the Esquire Bar, and finally to the Pioneer Hotel between 10:30 and 11:00 p. m.

Once in the hotel, the appellant headed towards the International and Terrace Ballroom areas. After observing the Hughes Christmas party for fifteen to twenty minutes, the appellant left the dance area and seated himself on a hallway stool. Rodney Dingle, a Hughes employee attending the party, testified he encountered the defendant between 11:00 and 11:45 p. m. in the hallway while searching for cigarettes. After directing Dingle to a nearby machine and then borrowing a cig-

arette, Taylor declined a light, stating "No, I have a book of matches."

Exactly when the fire started is a matter of great dispute. Both parties agree to its origin in the north-south hallway of the fourth floor, although one of the state's experts cited the third to fourth floor north staircase as an additional area of origin. The testimony as to when the fire was first detected runs generally from midnight to 12:05 a. m. The firemen arrived about 12:23 a. m. which is known from radio logs.

The combination of testimony from experts for both sides as to the burning characteristics of the carpet and testimony from hotel guests indicates a strong probability ignition occurred between 11:40 and 11:55 p. m., depending upon the amount of accelerants used, if any. The record indicates that earlier ignition of the carpet in conjunction with the heavy toxic smoke produced would have resulted in correspondingly earlier detection by hotel guests.

The first notice hotel personnel on the lobby level had of the fire was when an Old Pioneer Club busboy rushed through the main entrance at about 12:10—12:15 a. m. and informed the desk clerk that a man was yelling "fire" from an upper-floor window on the Stone Avenue side. Immediately after this, at 12:15 a. m., the desk clerk received a call on the switchboard from a lady in a third- or fourth-floor room who stated she smelled smoke in her room and thought there was a fire on the third floor. A bellman was then dispatched to investigate in the company of David Johnson, a custodian who overheard the conversation. Soon after leaving the elevator at the south end of the third floor north-south hallway, smoke forced the bellman to retreat because of a respiratory condition. He returned downstairs and reported the seriousness of the fire to the desk clerk who in turn called the fire department at approximately 12:20.

Meanwhile, Johnson had headed north in the third-floor hallway until he encountered Taylor standing alongside the north staircase looking up at the flaming stairs and fourth-floor landing. Taylor continued to merely observe the developing holocaust as Johnson, with limited effectiveness, tried to combat the raging fire with a fire extinguisher from a nearby cabinet. When the contents of the extinguisher were exhausted, Johnson raced down to the mezzanine-level bar area in search of additional extinguishers. There, he met Giles Scoggins, the hotel beverage manager, who directed him to nearby extinguishers and then followed Johnson as he returned to the third floor north staircase.

Upon arrival Johnson dropped the two extinguishers he was carrying and unsuccessfully attempted to operate a kinked fire hose the appellant had apparently pulled out of a nearby wall cabinet. At this point Scoggins arrived, whereupon Taylor exclaimed "I saw two colored boys with African hairdos and they were fighting and they started the fire." Scoggins testified that he subsequently was able to unkink and use the fire hose but that it had little or no effect on the ceiling-high flames. This lack of success and an explosion-like sound caused the abandonment of firefighting efforts.

The next two hours saw the deaths of helpless upper-floor guests as the result of falling, jumping, asphyxiation, and burns. The appellant, along with numerous other civilians, aided to a disputed degree in rescue efforts directed by the Tucson Police and Fire Departments.

At approximately 2:00—2:10 a. m. Scoggins approached Officer Sedlymeyer at police operations headquarters in the street southwest of the hotel and informed him that a black youth present at the early stages of the fire had claimed to have seen two other youths set the fire. Two detectives and then two uniformed officers elicited further details and then the latter two officers helped Scoggins search in and around the hotel.

At about 2:35—2:40 a. m. Taylor, wearing a white busboy jacket, was spotted by Scoggins near the ramp entrance to the third-floor roof area in the northeast section of the hotel. The appellant immediately removed this jacket and approached one of the officers, Lewis Adams, who was looking in third-floor rooms. He tapped Adams on the shoulder and stated "There are seven boys on the seventh floor or eighth floor running around and they don't belong there." Adams then proceeded to follow the appellant partially up the staircase towards the fourth floor until Scoggins called the officer aside and remarked that "that's the boy we are looking for." Adams testified that the appellant responded "sure" he would accompany him and his companion, Officer Carstensen, outside. While walking downstairs, Taylor stated "It's awful that somebody would set a fire like that."

Adams then reported to his supervisor at the intersection command post, Sgt. Alfred Lingham, that he had found the individual to whom the manager had referred. Lingham testified that the officer told him that the individual was agreeable to making a statement. At 2:41 a. m. Sgt. Lingham radioed police headquarters that "Officer Adams will be en route to the station with a subject we need a statement from."

After a one-block walk to Adams' vehicle, the appellant asked "You want me to sit in the back seat?" The officer responded "No. I don't see any reason for you to have to sit in the back seat. You are not under arrest. You can sit up front. Well I don't know you. I want to search you for my own protection." Adams then conducted a "patdown" search after which they proceeded to the police station.

Upon entering the station at approximately 2:44 a. m., the officer told Taylor to "have a seat" in the coffee room. Adams then briefed Desk Sgt. Kenneth Krieger, who in turn said he would get detectives.

After entering the coffee room, a Sgt. Rossetti, who had had previous contacts with appellant, asked the appellant, who was seated in the room with three to five police officers, whether he recognized him (Rossetti) and "how he had occasion to be at the Pioneer Hotel." Taylor stated that he did not recognize the sergeant and that he had gone to the hotel around 10:00 p. m. to see a friend named Tatum employed there as a dishwasher; that the rear door security guard stated Tatum had already gone home; that he proceeded to enter the building anyway through the parking garage and headed towards a party he knew would be going on because he had seen people decorating the previous night; that two blacks with Afro hairstyles (whom he later said were Mexicans) were fighting on the third floor and that he saw fire; that "it was a very bad fire. I don't know why anyone would want to do a thing like that"; and that he helped firemen by yelling in Spanish to guests who were about to jump from upper-floor windows.

At approximately 3:05 a. m. Officer Adams asked the appellant to accompany him to the main floor briefing room and, once there, to relate the evening's events. The appellant stated he had gone to the Pioneer in search of an employee named Tatum whom he discovered was not there; that he hung around a party he discovered on the second floor until an unknown woman stated she smelled smoke which could then be seen coming from air vents; and that he ran to the third floor and saw a Mexican boy and a Caucasian boy running. Adams then interjected that this sounded inconsistent with what he had previously been told and proceeded to read the departmental rights card.[1]

According to Adams' testimony, the appellant responded "sure" indicating that he understood these rights and agreed to go through his story again. Taylor then stated he had gone to the third floor and saw two men, one of them the manager, trying to extinguish a fire and that he was asked to turn the hose valve on in what proved to be an unsuccessful attempt to get it to work; that at the manager's request he obtained fire extinguishers from downstairs but they had little effect on the fire and he thus resorted to helping people evacuate the hotel; that he had, prior to this, seen two boys running in the halls and had tried to run them out thinking they were planning to rob patrons and had lied to Adams about them in the previous conversation because he did not want to "rat" on anyone; and that he had entered the hotel that evening through the rear parking garage and was extremely familiar with the layout of the Pioneer because he had worked there in the past.

After a twenty-minute conversation, at approximately 3:30 a. m., Det. Henry Gassaway arrived and, after Adams briefed the detective as to the statements made by Scoggins and Taylor, the appellant was turned over to Gassaway and Det. Milan Murchek. Just prior to this, Sgt. Rossetti had briefed Gassaway and supervisor Sgt. Moore as to what had been discussed in the coffee room.

Taylor was led upstairs to a second-floor detective-division interview room and, in the presence of Gassaway and Murchek, asked to describe what he had seen and done since the previous afternoon. Taylor stated that he had ridden downtown to a pool hall in the afternoon with a friend name Mike Tatum; that he walked to the

---

1. "You have the right to remain silent. Anything you say can and will be used against you in a court of law. You have the right to the presence of an attorney to assist you prior to questioning, and to be with you during questioning, if you so desire. If you cannot afford an attorney you have the right to have an attorney appointed for you prior to questioning. Do you understand these rights?

Now having been advised of these rights and understanding these rights will you answer my questions?"

Note that this is different from Rule 18 of the Rules of Procedure for the Juvenile Court, 17A A.R.S. which controls the admissibility of statements made by a minor. State v. Hardy, 107 Ariz. 583, 491 P.2d 17 (1971).

bus station, back to the pool hall, and then to the Pioneer around 10:30 p. m. in order to get a ride with Mike's brother; that, after the security guard had said Tatum had already left, he hung around a second-floor party for which he had previously seen people prepare; that while talking to some Mexican friends, a Mexican lady stated "I smell smoke" and saw the manager running up the stairs with a fire extinguisher; that, after following the manager to the third floor, he was told to remove the fire hose from its cabinet but water would not come out when the valve was turned on; that the manager said "let's get out of here" when the fire got out of control, and so he went down to the lobby and there spoke in Spanish with a burned Mexican girl; and that he had seen a Caucasian male and a long-haired Mexican male fighting near the scene of the fire but had seen only the backs of their heads.

At this point Taylor drew a diagram for Det. Murchek in order to illustrate the location of the fire and the unknown individuals. Murchek testified the appellant used this diagram to illustrate two separate fires he had allegedly seen: one on the north staircase steps between the third and fourth floors and another on steps leading from the third floor down to the second floor.

At approximately 3:55 a. m. Det. Gassaway was called out of the interview room to talk to Scoggins and a hotel security guard who had come down to the station. Upon reentering at approximately 4:15 a. m., Gassaway told the appellant he was not telling the truth or was holding back the identity of the individuals allegedly seen fighting in the hotel and proceeded to advise him of his rights from the departmental rights card.[2] Taylor allegedly responded that he understood these rights and agreed to answer the detective's questions. The appellant began repeating his story stating that he had walked downtown the previous afternoon, walked back home,

rode downtown to a poolhall with Mike Tatum, gone to the bus station, back to the poolhall and found Tatum had gone, and then proceeded to the Pioneer in search of him. Challenged by Gassaway, the appellant admitted lying about Tatum working at the hotel because "you were making hard faces on me and I just wanted to get you off my back." He then stated that he went to the Pioneer because he knew there would be a party there and possibly might see some friends whom he later admitted he did not encounter.

Confronted with Scoggins' version of the appellant's statements, a heated exchange ensued during which Taylor said he now remembered having gone to the third floor before the manager, but that the manager was mistaken as to what had been said and that the police could not prove otherwise, and that he would not "fink" on whom he actually saw. He eventually admitted that he saw no one run from the scene of the fire. The appellant then asserted that he had seen three Caucasians and two Mexicans unsuccessfully attempting to enter the hotel's liquor storage room and that the Mexican, who looked mean and had a gun in his waistband, probably started the fire. Taylor refused to "fink" on their identities saying only that one of the individuals sold drugs in a local park or poolhall. Another heated exchange occurred when Gassaway suggested the fire was set in conjunction with a plan to burglarize rooms, the appellant repeatedly screaming that the police could not prove anything and that "I didn't kill those people."

Taylor initially said he put on the white jacket in order to pass as an employee and steal drinks, but subsequently stated he put the jacket on only upon finding it after the fire broke out. The appellant at first rejected and then confirmed Scoggins' assertion that he already had the fire hose out of the cabinet and was attempting to operate it when Scoggins arrived at the third floor north staircase.

---

2. See footnote 1.

Gassaway testified Taylor admitted having set fire in the past to garbage receptacles, one or two trees, and had considered burning down an old empty house, but repeatedly denied responsibility for the Pioneer fire. The interview concluded sometime between 5:00 and 5:30 a. m., Murchek apparently remaining a short while after Gassaway's departure.

Between 5:40 and 6:00 a. m., Det. Rex Angeley, who had been briefed by Murchek, Moore and Gassaway, entered the interview room in which the appellant was now seated alone. Angeley testified that he had encountered Taylor between forty and fifty times since 1965 when he was working in the juvenile division and was recognized upon entering the room.

The appellant stated he had gone to the Pioneer to see an employee named Grigsby but the security guard would not let him in; that he returned later to see an employee named Tatum and was again denied admission but nevertheless was able to get inside and hung around a second-floor party; that he saw two black boys with Afro hairstyles on the fourth floor, who he later said were two Mexican boys, and that one had a gun and looked suspicious and that he witnessed them set the fire but was unable to give a description; that it actually was a long-haired Caucasian boy and a hippy Mexican whom he saw on the fourth floor and that he saw the Mexican whom he recognized as a dope-pusher in a local park and poolhall, set the fire. At the conclusion of the 35- to 40-minute interview, or approximately 6:15—6:30 a. m., the appellant asked to take a lie detector test and was granted his request to make two telephone calls.

Shortly after this, Capt. Lynden Gilmore of the Tucson Fire Department, who had been briefed by Sgt. Moore and Det. Gassaway, interrogated the appellant. During the 10-minute interview Taylor stated he had heard a woman mention she smelled smoke and ran up to the fourth floor and saw the fire. He repeated that he "didn't kill those people" despite Det. Gassaway's repeated accusations. At approximately 6:50—7:00 a. m. the appellant was taken to a nearby building for a polygraph examination which was administered by Officer Douglas Scoopmire at 7:15 a. m. Both of them returned to the detective division around 7:30—7:45 a. m.

Sgt. Patrick McGuire arrived at the station shortly before 8:00 a. m. to assume supervisory duties from Sgt. Moore. Det. Angeley then briefed them both as to his knowledge of the case. Soon thereafter Sgt. McGuire instructed the detectives to place Taylor under arrest for arson. Angeley was assigned to make out the juvenile interim report. At approximately 9:00 a. m. Det. David Smith, who had been briefed by Sgt. McGuire, interrogated the defendant in a second-floor detective-division interview room for about ten minutes. Smith read the departmental rights card,[3] and Taylor responded that he understood and agreed to answer the detective's questions. The appellant stated that he had gone to the Pioneer for a party about which he had heard; that he had tried to restrain one of four Mexicans looting rooms but was unable to because a police officer told him to go home; that this Mexican must have started the fire because of the look in his eye; and when asked if he set the fire Taylor stated, "No, I didn't want to kill all those people." Smith then accompanied the appellant when he was transported to the Juvenile Center at 9:30 a. m. They proceeded into the receiving room where the receiving officer, Gerald Soop, informed Taylor of his rights, the nature of the charge and that he could be tried as an adult. The appellant then requested he be provided with an attorney. Detective Smith then took the appellant to an interview room at the Center, after which they returned to the receiving room where a search disclosed the

3. See footnote 1.

appellant was carrying five packs of matches.

The Pima County Attorney filed a petition alleging delinquency on January 12, 1971, charging the appellant with responsibility for arson at the hotel and the murder of 28 persons. After a lengthy hearing Taylor was transferred on April 22, 1971, from Juvenile Court to stand trial as an adult. The Court of Appeals in *In re* Anonymous, Juvenile Court No. 6358–4, 14 Ariz.App. 466, 484 P.2d 235 (1971), upheld the validity of the transfer hearing, stating that there was sufficient evidence to establish probable cause that a crime had been committed and that the minor was responsible. The court determined that there was sufficient evidence from which the juvenile court judge could conclude that the minor was not amenable to treatment or rehabilitation as a delinquent child through available facilities, was not committable to an institution for mentally deficient or mentally ill persons and that the safety or interest of the public required transfer for criminal prosecution.

The Court of Appeals also found that statements made by the appellant before he was advised of his rights by Officer Adams were not made while in custody and thus not the product of "custodial interrogation." The court declined comment on the admission of subsequent statements, stating that even if their admission was error, the transfer hearing would not be vitiated. This Court denied review on June 8, 1971.

Appellant has raised eighteen allegations of error in this appeal, with numerous subheadings, dealing with almost every stage of the prosecution, from the transfer proceedings through denial of his motion for a new trial. The state has filed a cross-appeal asserting other errors by the trial court. We shall discuss in detail only those contentions which we find to be of arguable merit. To avoid making this opinion an even greater opus, we must of necessity dispose of many contentions summarily.

## I. TRANSFER HEARING

The first issue presented by appellant concerns the constitutionality of Rule 14, Rules of Procedure for the Juvenile Court, and related questions as to the validity of the transfer hearing. Much of this issue was decided in *In re* Anonymous, *supra*, and has become the law of the case. We find no merit to the assertion that Rule 14, *supra*, is unconstitutional because of vagueness and lack of specificity. The phrase "amenable to treatment or rehabilitation," especially as applied to the appellant, is clear. Taylor had been committed to the Industrial School at Fort Grant on previous occasions and had received the services of the juvenile court over a number of years. Obviously there was nothing further the juvenile court could do to treat or rehabilitate him. There is no support in the record for appellant's contention that the trial court erred in denying his motion to remand to juvenile court.

## II. CONDUCT OF COUNSEL

Under this heading we shall treat two of the "Questions Presented" by appellant in his brief along with their various subdivisions. Appellant asserts that he was denied due process of law when, on order of the court, the prosecutor failed to furnish him the names of witnesses he actually intended to call. Apparently, after prompting by appellant through the court, the prosecutor's witness list was reduced from approximately 650 to 250 persons.

This case was not the routine case because literally hundreds of people of the city of Tucson had some role in the suppression of the fire or were eyewitnesses to the fire. The reluctance of the prosecutor to limit the witnesses available to present his case is understandable. The defense counsel obviously made a well-organized effort to cover the list presented. The trial judge used his discretion in supervising the pretrial efforts of both counsel and heard defense counsel's charges of blatant misconduct on the part of the prosecutor in this regard. We are not con-

strained to impose our assessment of the circumstances over that of the trial judge, especially when appellant has shown no specific prejudice. The appellant cites State v. Singh, 4 Ariz.App. 273, 419 P.2d 403 (1966), as being analogous and supporting his position, but we do not find this to be correct.

The appellant further asserts that the prosecutor failed to disclose evidence helpful to the defendant pursuant to Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and the court's order. He asks us to take judicial notice that the particular prosecutor in this case neither believes in nor abides by the doctrine of disclosure. We decline to do so as being wholly inappropriate. Appellant seems to argue that because the prosecutor made no further voluntary disclosures after a September 13, 1971, disclosure hearing, it is incongruous to believe that the prosecutor complied with the law and the order of the court. The appellant's bare assumption that something was withheld does not show the requisite prejudice. We do not reverse on conjecture alone.

Next, we find an assertion by the appellant that he was denied a fair trial by reason of the prosecutor's misconduct. The alleged misconduct concerns the prosecutor's opening statement and his numerous disruptive objections and speeches. He claims the court erred in denying appellant's motion to substitute prosecutors. Appellant contends that there were 2,043 objections or interruptions by the prosecutor in the course of the 42-day trial. The county attorney asserts that there were 1,737 objections and interruptions on behalf of the state and 1,111 by the appellant's counsel. Over half of the objections by either side were overruled. We did not make a statistical count but in reading the trial transcript in its entirety we saw that both prosecution and defense interposed numerous objections which were lacking in validity. The prosecutor was overzealous and at times overly insistent in asserting his position. In State v. Moore, 108 Ariz. 215, 495 P.2d 445 (1972), we said:

". . . Misconduct alone will not cause a reversal, as a new trial should not be granted to punish counsel for his misdeeds, but where the defendant has been denied a fair trial as a result of the actions of counsel, we will reverse. . . ." 108 Ariz. at 222, 495 P.2d at 452.

The conduct of the prosecutor was not so outrageous and improper as to deny the appellant a fair trial. The able and experienced trial judge while exhibiting commendable patience fully controlled the trial. Defense counsel was most capable and provided a good match for the prosecutor. Appellant's counsel takes great comfort from State v. Moore, supra, but the situations are not the same.

Appellant moved for Substitution of Prosecutor on August 23, 1971, asserting a conflict of interest which precluded the prosecutor from fairly discharging his duty. He alleged that the attorney representing the Pioneer Hotel had previously represented the deputy county attorney in a personal legal action. The trial judge denied the motion, and we find no abuse of discretion here. State v. Belcher, 106 Ariz. 170, 472 P.2d 39 (1970), cited by appellant, does not support his position because of the great difference in the facts.

It is interesting to note that appellant's counsel was found in contempt of court (though fined only five dollars) for making the appellant available for press interview, contrary to the court order. We refer to this only to indicate that in this hard-fought battle both counsel became emotionally involved, and often conducted themselves with excessive zeal.

The trial judge at the time of sentencing made a comment to the appellant which squarely meets the issue of misconduct. He said: "As I say, I never have seen a case better defended. In my judgment the trial was completely fair."

## III. CHALLENGE TO THE JURY

Again we treat two of appellant's questions under one heading.

The appellant, on December 6, 1971, filed a challenge to the jury panel pursuant to Rule 213, Rules of Criminal Procedure, 17 A.R.S. Thereafter, on January 25, 1972, an amended challenge was filed asserting numerous imperfections in the system of selecting and excusing jurors. Appellant is not entitled under our law to a perfect jury panel empaneled through a perfect system, as such is not possible. He shows neither prejudice nor denial of due process. State v. Mahoney, 106 Ariz. 297, 475 P.2d 479 (1970), *cert. denied,* 401 U.S. 917, 91 S.Ct. 898, 27 L. Ed.2d 818 (1971).

In late August, 1971, the appellant demanded to know whether or not the death penalty was being sought by the state. He subsequently filed a motion in limine challenging the death penalty. The court, however, denied appellant's motion. The appellant asserts that the court's written questionnaire submitted to the jury with reference to the death penalty was prejudicial. He further objects to the fact that the voir dire of the jury encompassed the death penalty although the state ultimately in argument did not demand that penalty nor was it imposed. We find no merit to appellant's position as the question of death penalty became irrelevant by reason of the fact that it was removed from the case by the jury's verdict. Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968); State v. Bray, 106 Ariz. 185, 472 P.2d 54 (1970).

## IV. ADMISSION OF MATCH BOOKS AND RELATED EXPERT TESTIMONY

The appellant, on September 20, 1971, had filed what he termed an Objection in Limine to exclude from evidence any reference to the match books and matches taken from Taylor. He also contended in that motion and in a subsequent one that no expert opinion should be permitted as to the specific cause of the fire.

At the trial, evidence regarding matches in the possession of the appellant after his arrest was permitted. The state's expert witness was also permitted to testify as to the origin of the fire and the fact that tests showed that matches could have started the fire.

We find no error with regard to the admission of the evidence of the matches in Taylor's possession. One witness, Wallmark, testified that Taylor made admissions to him indicating the use of matches.

We find no merit to the assertion that the seizing of the matches was illegal. In a hearing the trial court denied appellant's motion to suppress, finding that there was probable cause to arrest Taylor and take him to the juvenile facility. State v. Boyer, 106 Ariz. 32, 470 P.2d 439 (1970).

We hold that the trial court was well within the limits of its discretion when it permitted the expert witness to testify as to the tests conducted regarding how the fire started. Appellant's expert was also allowed to testify as to tests he conducted.

## V. SUFFICIENCY OF EVIDENCE

The appellant attacks the sufficiency of the evidence at all stages of the proceeding from the preliminary hearing through the trial. He asserts that his motion for directed verdict should have been granted at the close of the state's case in chief, and that the court should have granted his motion for new trial because there was not sufficient evidence to support the jury's verdict. We do not agree with appellant's evaluation of the evidence. There is substantial evidence to uphold the verdict. State v. Rhymes, 107 Ariz. 12, 480 P.2d 662 (1971); State v. Harvill, 106 Ariz. 386, 476 P.2d 841 (1970).

## VI. STATE'S EXPERT WITNESS

█ Appellant contends that the court erred in permitting the state's expert witness on arson to testify concerning tests he conducted regarding the origin and cause of the fire. He further objects to the admission of photographs of certain tests, and questions the sufficiency of the foundation for the witness's testimony that the fires were simultaneous. We do not propose to discuss here the hundreds of pages of testimony involved, but suffice it to say that the trial judge did not abuse his discretion. State v. Brierly, 109 Ariz. 310, 509 P.2d 203 (1973).

█ The final point made by appellant under this heading concerns an allegation that the judge erred in limiting the impeachment of the expert because he refused to permit the use of a page of a book describing a test. The expert did not recognize the test as authoritative, and the judge wouldn't permit counsel to proceed. Counsel cites no legal authority for his assertion that this ruling was error. *See* Wall v. Weaver, 145 Colo. 337, 358 P.2d 1009 (1961).

## VII. JURY INSTRUCTIONS

█ The next contention of appellant is in regard to the trial court's failure to instruct the jury on manslaughter. We are aware that the court is duty-bound to instruct on every degree of homicide embraced in the information which the evidence suggests even though no request has been made therefor. State v. Madden, 104 Ariz. 111, 449 P.2d 39 (1969).

█ In this case we are not dealing with the usual murder charge. This point was well presented in the previous appeal to the Court of Appeals in *In re* Anonymous, *supra*.

"A person who willfully and maliciously sets fire to a building is guilty of arson, a felony. A.R.S. § 13–232. Murder is the unlawful killing of a human being with malice aforethought. A.R.S. § 13–451. A murder which is committed in the perpetration of arson is murder of the first degree, A.R.S. § 13–452, whether willful and premeditated or only accidental. People v. Chapman, 261 Cal. App.2d 149, 67 Cal.Rptr. 601 (1968), cf. State v. Akins, 94 Ariz. 263, 383 P.2d 180 (1963); State v. Serna, 69 Ariz. 181, 211 P.2d 455 (1949); 1 Wharton's Criminal Law § 251 at 539." 14 Ariz.App. at 472, 484 P.2d at 241.

The holding of Madden, *supra,* cannot be held to apply to this type of charge. State v. Clayton, 109 Ariz. 587, 514 P.2d 720 (1973).

## VIII. BILL OF PARTICULARS

█ Appellant filed a motion for Bill of Particulars on August 25, 1971, asking the court to order the prosecutor to reveal the detailed particulars of what the state intended to prove. The trial court denied the motion. This is a matter within the discretion of the trial court and no abuse is shown. State v. Gortarez, 98 Ariz. 160, 402 P.2d 992 (1965).

## IX. VOLUNTARINESS OF APPELLANT'S STATEMENTS

We find this issue to be the most difficult issue presented in the appeal. The voluntariness of Taylor's statements to the police has been hotly contested through all of the various stages of the proceeding. As we have previously indicated, the Court of Appeals in *In re* Anonymous, *supra,* considered this matter to a limited extent as regards the juvenile transfer hearing. The issue was raised in the preliminary hearing and thereafter was the subject matter of extensive testimony in a pretrial suppression hearing.

The Supreme Court accepted jurisdiction of a petition for special action in State v. Hardy, 107 Ariz. 583, 491 P.2d 17 (1971), and held that in determining the voluntariness of Taylor's statements and whether he intelligently comprehended his rights, the presence of the child's parents or their consent to a waiver of rights is only one of the elements to be considered by the

trial court. The trial judge thereafter heard additional testimony on the issue and ruled as follows:

"The Court finds that the defendant understood his constitutional rights not to incriminate himself and to be represented by counsel and that his statements to the police officers were made voluntarily."

Appellant urges us to consider the totality of the circumstances surrounding the interrogation of Taylor. Gallegos v. Colorado, 370 U.S. 49, 82 S.Ct. 1209, 8 L.Ed.2d 325 (1962); People v. Lara, 67 Cal.2d 365, 62 Cal.Rptr. 586, 432 P.2d 202 (1967), *cert. denied*, 392 U.S. 945, 88 S.Ct. 2303, 20 L. Ed.2d 1407 (1968). This we do in perusing over a thousand pages of pretrial hearing transcript. We note that there are marked conflicts in the testimony, and we must in our appellate role resolve those conflicts in favor of upholding the position of the trier of fact. State v. Hughes, 104 Ariz. 535, 456 P.2d 393 (1969).

With the foregoing in mind, we shall briefly examine the pertinent facts. At the time of the statements in question, Taylor was 16 years and 8 months old. He was of Mexican and Negro descent and lived in a fatherless poverty-level home. He claimed a tenth-grade education although the juvenile records indicate that he had gotten through only the eighth grade. The extensive psychological evaluation prior to trial indicates that Taylor was functioning at the borderline level of intelligence with a low average potential. He was otherwise normal mentally.

Taylor had had numerous contacts with the juvenile court starting at age 11. He was sent to the Arizona State Industrial School at Fort Grant on four separate occasions. On his last commitment to Fort Grant, he had so successfully feigned epileptic seizures that he was sent to the Arizona State Hospital.

The offenses involved were serious charges including armed robbery, burglary and larceny. Although he had not participated in a transfer hearing, he was warned in the past that he could be transferred to adult court to face charges as an adult. In the course of these events he had also become acquainted with the Miranda rights.

 We now turn to the testimony of the interrogation which was set forth earlier in our recital of the facts. In examining this testimony we have come to the conclusion that Taylor was not in custody until Officer Adams, on realizing the inconsistency of the appellant's statements, read him the Miranda rights card.[4] State v. Bainch, 109 Ariz. 77, 505 P.2d 248 (1973). We are aware that there is testimony which if believed could lead to a conclusion that the appellant was in custody much sooner, thus necessitating formal Miranda warnings, but there is substantial testimony to support the finding of the trier of fact that the prior interrogation was consistent with questioning the only witness who apparently had information concerning the origin of the fire. State v. Hughes, *supra*. This issue was also considered in *In re* Anonymous, *supra*.

 We consider now appellant's contention that Taylor was a frightened, ignorant child subjected to vigorous questioning and badgering by experienced police officers over a period of seven hours without sleep or food. Taylor's own testimony indicates that he rose from his bed at 4:00 p. m. on the 19th of December, 1970, only some seven hours prior to the discovery of the fire. Our previous recital indicates that the questioning was long (almost seven hours) and eight police officers and a fire department official at one time or another talked to and interrogated the appellant. However, we are impressed by the fact that despite this alleged overwhelming atmosphere, the appellant never confessed to anything. He continued through an ever-changing pattern of fabrications to protest his innocence, and ultimately volunteered to take a lie detector test. In fact,

4. See footnote 1.

the inconsistencies which pervaded Taylor's statements up to the time Officer Adams read him his Miranda rights were of greater significance than subsequent statements. The lack of food and sleep arguments are not borne out by the facts.

We find ourselves in the same position as was the California Supreme Court in People v. Lara, *supra,* which found on the basis of all the testimony that the defendant had the capacity to understand his rights and the effect of a waiver of those rights.

Our examination of the record convinces us that Taylor's statements were voluntarily made.

■ As an additional point under this heading, appellant raises the question of the admissibility of statements Taylor made to a detention officer while at the juvenile facility. Here again we have a conflict. The officer testified that Taylor volunteered the statements without query from the officer. The officer also testified that he admonished appellant about discussing the case with him but appellant persisted.

We find no error here nor in the court's refusal to permit cross-examination regarding the witness's refusal to discuss his testimony with defense counsel prior to the trial. State v. Best, 15 Ariz.App. 77, 486 P.2d 189 (1971).

## X. COURT RULINGS ADMITTING OR EXCLUDING EVIDENCE

Appellant cites numerous illustrations in the record where he contends the court erred in admitting prosecution testimony. He does not demonstrate how these rulings prejudiced the appellant nor does he, except in three instances, cite any authority. In some instances where error is claimed, he failed to object to the evidence. We find no reversible error here.

We next find numerous assertions of error based on the court's sustaining the prosecutor's objections to evidence presented by the appellant. He asserts that these errors are sufficiently prejudicial, independently or collectively, as to require reversal. Here again we have no specifics and little authority. We did not find reversible error.

## XI. COURT'S PERMITTING STATE TO REOPEN

After the appellant had started putting on his case, the state moved to reopen in order to present the testimony of Robert Jackson who had been detained at the juvenile facility at the same time as Taylor. The appellant objected to the state's reopening contending that the witness was available prior to the time the state rested. The court refused the request to reopen but indicated that the state could renew its motion at the close of the appellant's case.

At the conclusion of the appellant's case the state was permitted to reopen and present the testimony of Jackson. In ruling on the state's motion, the court said:

"All right. I might also state for the record that my decision to permit the state to re-open is that the state had made the motion early in the defense case, only after three or four witnesses testified, and I denied it at that time primarily because of the objection of the defendant as to the interruption of his case. That's all I think needs to be said." (R.T.March 15, 1972, p. 3).

Argument and discussion before the court indicated that on the Monday when Jackson was present at court he was not yet under subpoena by the state. Thereafter, before making use of his testimony, the prosecution had him take a lie detector test.

As the appellant indicates in his brief, the testimony of Jackson was crucial. It was the only testimony of a seven-week trial which the jury wanted re-read to them during their deliberations. In essence, he testified that Taylor told him that Taylor started the fire. He said that Taylor indicated he squirted lighter fluid on the wall and lit it. He heard someone coming and took off.

Appellant concedes that the trial judge is given great discretion in relation to the order of proof and in relation to the granting of leave to reopen. State v. Favors, 92 Ariz. 147, 375 P.2d 260 (1962). He, however, contends that there is an abuse of discretion here which falls under State v. Cousins, 4 Ariz.App. 318, 420 P.2d 185 (1966); *reh. denied,* 4 Ariz. App. 468, 421 P.2d 901; *review denied,* January 17, 1967. We do not agree. Appellant had his chance to hear the testimony of Jackson before he was well into his own case. After he objected to the state's attempt to reopen at that time, he knew the court would entertain the motion again at the close of his case. It would make no difference in the result if Jackson's testimony came in in rebuttal rather than in the case in chief.

## XII. APPELLANT'S MOTION FOR DISCOVERY AND INSPECTION

The appellant here complains that his Motion for Discovery and Inspection filed September 15, 1971, was in all but one respect denied. He contends that it was an abuse of discretion for the court to refuse to order the production of appellant's statements not yet revealed in previous hearings, and any evidence of pretrial identification. He asserts that at least an *in camera* inspection of photographs exhibited to witnesses in pretrial identification of the appellant should have been ordered. State ex rel. Berger v. Superior Court, 105 Ariz. 473, 467 P.2d 61 (1970).

State ex rel. Berger, *supra,* talks of compelling and exceptional circumstances where pretrial identification becomes a material issue. Appellant's conjectural comments do not indicate this matter falls within the standards set by that case.

The appellant fails to specifically identify the statements of appellant which should have been produced. *See* State v. McGee, 91 Ariz. 101, 370 P.2d 261 (1962), which holds that a motion for inspection of statements of defendant and other documents is addressed to the sound discretion of the court. We find no abuse of discretion here.

## XIII. ERROR IN GIVING CERTAIN STATE'S INSTRUCTIONS AND FAILURE TO GIVE CERTAIN OF DEFENDANT'S INSTRUCTIONS

We have examined the instructions given to the jury by the trial court and we hold that the jury was properly instructed. We find no merit to appellant's contentions in this regard.

## XIV. USE OF TRANSCRIPTS OF PRIOR TESTIMONY OF DAVID JOHNSON

The state moved for a continuance prior to trial because of the inability of a witness, Johnson, to appear. The appellant opposed the motion for continuance and the state asked leave to have the transcripts read to the jury in the event the continuance was denied. The state also asked that deputy county attorney Dingeldine, who was present at the hearing at which Johnson's testimony was taken, be permitted at the time of the reading to make indications on charts according to his recollection of what Johnson had done.

Appellant contends that the trial court erred in requiring the whole transcript, both direct and cross-examination, to be read. He asserts that the cross-examination in the earlier hearing contained prejudical matters which he preferred to avoid at the trial. He properly objected to the use of the cross-examination testimony. However, appellant cites no authority to support this contention. Here again we have a matter within the discretion of the trial court. State v. Head, 91 Ariz. 246, 371 P.2d 599 (1962), *cert. denied,* 373 U.S. 942, 83 S.Ct. 1550, 10 L.Ed.2d 697 (1963).

## XV. COURT'S REFUSAL TO PERMIT A DEMONSTRATION DURING CLOSING ARGUMENT

Appellant contends that he was unduly restricted in his closing argument by rea-

son of the trial court's refusal to permit a demonstration. Counsel for appellant wished to use a magnet to demonstrate its action on a metal staple from a match book. He contended that this would have high-lighted the absence of any metal staples in the debris on the hotel's fourth floor.

We have previously indicated that attorneys are given wide latitude in their arguments to a jury. State v. Brooks, 107 Ariz. 320, 487 P.2d 387 (1971). However, here we find no abuse of the discretion reposed in a trial judge. We cannot but classify the refusal to permit the demonstration as harmless if by some stretch of the imagination the refusal could be called an abuse.

## XVI. MOTION FOR NEW TRIAL BASED ON NEWLY DISCOVERED EVIDENCE

The appellant on April 21, 1972, filed a motion for new trial with this court, as the case was then proceeding on appeal. The new-trial motion was remanded to the trial judge who after hearing denied the motion.

The main basis for the appellant's motion was a statement by the witness, Jackson, wherein he admitted to perjury at Taylor's trial. Also presented were affidavits of friends of Wallmark and Jackson to corroborate the alleged fact that they had lied at the trial.

At the hearing, the position of appellant was not borne out. Jackson, even though granted appointed counsel and immunity from prosecution, unequivocally affirmed his trial testimony.

In addition, appellant asserts machinations, intimidation and subornation of perjury on the part of the prosecutor and his investigator. These charges are supported only by conjecture and innuendo, and if they have any basis, in fact, they are matters for a totally different proceeding.

The refusal of the trial judge to hear testimony of friends of Jackson and Wall-

mark was not error. This type of collateral impeachment under the facts here is not appropriate.

Appellant cites State v. Merryman, 79 Ariz. 73, 283 P.2d 239 (1955) as supporting his position. We do not agree. We find State v: Kidwell, 106 Ariz. 257, 475 P.2d 241 (1970), correctly states the rule of law. The trial court did not abuse its discretion.

## STATE'S CROSS–APPEAL

In view of our disposition of the appellant's case on appeal, we see no need to discuss the points raised by the state's cross-appeal. One matter is worthy of comment, however. Subsequent to the trial court's dismissal of the arson charge, we held that a defendant may be charged and convicted for murder and for the arson which caused the homicide. State v. Miniefield, 110 Ariz. 599, 522 P.2d 25 (1974).

The judgments of conviction and sentence are affirmed.

STRUCKMEYER, V. C. J., and LEVI RAY HAIRE and EINO M. JACOBSON, Court of Appeals Judges, concurring.

Note:

CAMERON, C. J., and HOLOHAN, J., did not participate in the determination of this matter. LEVI RAY HAIRE and EINO M. JACOBSON, Court of Appeals, Judges, Division, One, sat in their stead.

LOCKWOOD, Justice (dissenting):

An examination of the record leaves me extremely disturbed with the majority's analysis of two important aspects of this case. The immense tragedy out of which this matter arose cannot negate constitutional safeguards which apply to all defendants alike.

## CUSTODY

The majority casually disposes of the question of when Louis Taylor was taken into custody in two sentences in their section on "Voluntariness of Appellant's Statements" by concluding that "there is

substantial *testimony to support the finding* of the trier of fact." The nature of this "substantial testimony" is not related to us in the majority's opinion, nor is it discoverable from a survey of the record.

The determination of when the defendant was taken into custody is critical as "[o]nce custody is established no interrogation whatsoever, even the routine or casual, is permitted unless a valid waiver of defendant's stated [Miranda] rights is demonstrated." State v. Mumbaugh, 107 Ariz. 589, 491 P.2d 443 (1971). In Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the United States Supreme Court held:

"* * * the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination. By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." 384 U.S. at 444, 86 S. Ct. at 1612, 16 L.Ed.2d at 706.

In State v. Mumbaugh, supra, we stated:

"Whether defendant is in custody is determined by an objective test, based on the evidence. Police testimony that the defendant is free to go is relevant but not controlling. Similarly, defendant's subjective belief that he is not free to go is only a factor worth considering. Custody must be determined by an analysis of the relevant circumstances with particular attention to probable cause gauged by the 'reasonable man' test.

* * * * * *

"But a finding that no probable cause exists does not necessarily mean that there was no 'custody' or that defendant was not 'otherwise deprived of his freedom of action in any significant way.' There exists, then, the second situation where the police detain someone on mere suspicion where no probable cause exists.

In such cases detention constitutes custody where a reasonable innocent man under the relevant circumstances would believe he is not free to go. [citations omitted]." 107 Ariz. at 594-95, 491 P.2d at 448-49.

A review of the "relevant circumstances" leads me to the conclusion that the defendant was sought at the hotel as more than a mere witness and, in fact, was effectively taken into custody by Officer Adams just after Sgt. Lingham directed him to take Taylor to the police station for a statement.

Attention was originally focused on the defendant when Giles Scoggins, the hotel beverage manager, noticed him coming down the steps between the mezzanine and lobby levels at approximately 2:00 a. m. Upon seeing the defendant, Scoggins turned to Leroy Brockbank, Vice President and Director of the Pioneer Hotel, and remarked "take a good look at that fellow there, he knows something about the fire." Scoggins then proceeded outside and informed Officer Sedlymeyer of the defendant's statements at the early stages of the fire. Officer Adams testified that while scanning the crowd on Stone Avenue Scoggins commented "the boy we are looking for might have set it because he was right there when I first got there." The Court of Appeals summarily dismissed the relevance of this remark by stating "we believe it was nothing more than a gratuitous remark by one who had not seen the fire start." In re Anonymous, 14 Ariz.App. 466, 484 P.2d 235 (1971). This conclusion may have been prompted in part by Adams' testimony that the remark by Scoggins did not persuade him to view the defendant as a suspect: "* * * just because a man says so and so set a fire, it's not necessarily so."

I feel compelled, however, to assess it greater significance. This remark, in conjunction with Taylor's unexplained presence at the early stages of the fire on a floor which contained only guest rooms and the natural desire of the police to ap-

prehend any arsonist responsible for this tragedy, undoubtedly cast some degree of suspicion on the defendant. Further evidence of the tone of Scoggins' remark is indicated by the fact that upon finding the defendant, Scoggins immediately retrieved the white busboy jacket that Taylor had discarded, retaining that piece of evidence for eventual use at the trial. Moreover, prior to pointing out Taylor to Officers Adams and Carstensen, Scoggins stepped into a small alcove or room, and apparently motioned the two officers to follow. Scoggins then peeked around the corner, pointed at Taylor and stated "that's the boy we are looking for." These factors indicate the defendant was considered more than a possible witness. The bare fact that an individual is under suspicion, of course, is not enough to establish custody. State v. Bainch, 109 Ariz. 77, 505 P.2d 248 (1973). It does, however, constitute an input into what *Mumbaugh*, supra, referred to as the "relevant circumstances."

Officer Adams testified that he asked the defendant to accompany him outside and the response was "sure". Taylor, on the other hand, testified "[h]e told me to come downstairs with him." Adams testified that, except for a brief distance on the third floor, he alone escorted the defendant downstairs and then to the intersection command post. He also testified the defendant was neither handcuffed nor physically touched at any time. Taylor, on the other hand, testified "[h]e was holding my arm" and "[w]hen I got outside, * * * he told me to stay put in the corner—right by the corner." Officer George Biggs discredited a portion of Adams' version by testifying he saw the defendant during this period of time flanked by two officers on the mezzanine level.

Adams and the defendant walked north on Stone Avenue to a police vehicle after Sgt. Lingham had instructed the officer to go to the station and obtain a statement. Taylor testified "Officer Adams told me to

come on" and "grabbed me by the arm." The defendant felt he was not given a choice as to whether he was going to the station: "I didn't have no other choice." Adams, on the other hand, denied he physically touched the defendant, yet conceded he was unsure what he would have done had Taylor attempted to flee.

At this point I feel custody was firmly established. The defendant was not *asked* to go to the police station, he was *taken*. A survey of the record reveals only one instance, at the transfer hearing, where Adams asserted he in any way *asked* the defendant if he would accompany him to the station. Even in that testimony it is clear that the alleged inquiry was made only *after* the officer had begun escorting Taylor to his vehicle. Thus if Adams commented to Sgt. Lingham that the defendant was agreeable to making a statement it would have been merely an assumption on the officer's part.[1] At the preliminary hearing Adams testified:

"A. I told Sergeant Lingham that I found the boy that I was looking for and this was him.

"Q. Anything more?

"A. Not that I recall.

"Q. What were you told?

"A. To take him to the detectives for a statement.

 * * * * * *

"Q. At that point did you say anything to Louis Taylor?

"A. Yes, I did.

"Q. What was that?

"A. Pointing north I said, 'My car is over here.'"

My conclusion as to what occurred is further strengthened by another portion of the officer's testimony:

"Q. With regard to the conversation with Taylor in [sic] route to the station, will you tell us what the conversation was at that time as you recall it?

---

1. Adams never testified he told Sgt. Lingham that the defendant had agreed to make a state-

ment. Sgt. Lingham, however, testified that the officer made such a remark.

\* \* \* \* \* \*

"A. Mr. Taylor asked me why we were going to the station. I explained to him that I had understood he was at the scene of the fire and that the detectives would like to talk to him to find out what he had seen or done.

"Q. And at the time you related this to him, did he indicate in any way that he didn't want to accompany you.

"A. No.

"Q. By action or by word?

"A. No. He gave no indication."

The police station was approximately a two or three block drive from the Pioneer Hotel. It seems almost certain that the defendant would not inquire why they were going to the station if Adams had asked him if he would go to the station in order to make a statement only seconds before getting in the car. The fact that "[h]e gave no indication" when told why he was being taken to the police station manifests continued submission to the custody of the officer.

The fact that Officer Adams *told* the defendant he was not under arrest and permitted him to ride in the front seat of the car is not controlling. This factor, like the fact that a "patdown" search was conducted, is merely an item of information bearing on the question of whether "a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." Miranda v. Arizona, supra.

Further evidence of the nature of Officer Adams' relationship to the defendant that morning is provided by a comment the officer made soon after arrival at the station. Adams testified twice at the preliminary hearing that as he seated Taylor in the coffee room and before conferring with the desk sergeant he requested one of his colleagues "keep an eye on" the defendant: "I told somebody to keep an eye on him, that he was at the scene of the fire." [2] The coffee room, variously described as 10′ x 10′ to 15′ x 20′, at that point contained three to five police officers and the defendant. Under the facts of this case I believe a "reasonable innocent man under the relevant circumstances would believe he \* \* \* [was] not free to go." State v. Mumbaugh, supra.

The state may not remove the custodial environment or negate its consequences by arguing that the defendant was casually questioned by Rossetti and initially by Adams only as a "witness." [3] First, Rossetti obviously had no such impression as he merely heard that Taylor was found "wandering around the hotel." Second, even if the description was appropriate, I would be inclined to accord it little significance in a case such as this. In Commonwealth v. Banks, 429 Pa. 53, 239 A.2d 416 (1968), the Pennsylvania Supreme Court commented:

"The Commonwealth argues that up to the moment Banks first admitted his participation in the crime, he was merely being questioned as 'a witness' to a crime and it was unnecessary to advise him of his right to remain silent so long as this role continued. With this we cannot agree. The appellation given the individual questioned is not controlling. Otherwise the police could evade the procedural safeguards required by *Escobedo*, supra, and *Miranda*, supra, to protect one's privilege against self-incrimination during police questioning by inter-

2. I am aware that at the subsequent voluntariness hearing, Adams testified he could not recall this prior testimony or that he, in fact, made such a statement.

At the trial Adams hedged on his denial: "[i]t's possible I might have told somebody to keep an eye on him."

3. It is interesting to note that while the defendant was allegedly brought to the station

as a "witness" in order to secure a statement, no recording devices were utilized that morning in order to make a record of what was being said.

In addition, Officer Adams testified that he could not recall seeing any civilians other than the defendant brought to the station as witnesses by the police. We know, of course, that Scoggins and a hotel security guard arrived at the station around 4 a. m.

viewing everyone as 'a witness.' If questioning is initiated and pursued during custodial interrogation, proper warning of constitutional rights is first required, Miranda v. State of Arizona, supra." 429 Pa. at 58, 239 A.2d at 418–19.

Statements made by the defendant after being taken into custody at approximately 2:41 a. m. in front of the Pioneer and before Officer Adams informed him of his rights were improperly admitted at the trial. Statements made by the defendant after Officer Adams advised him of his rights and before the second portion of the Gassaway interview commenced at approximately 4:15 a. m. are inadmissible as a product of illegal custodial interrogation. The test to be applied is "Whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed. 2d 441 (1963). In this case it is clear the connection between the illegal conduct by the police and the statements made by Taylor in response to questions by Adams, Murchek and Gassaway was not "so attenuated as to dissipate the taint." Nardone v. United States, 308 U.S. 338, 60 S.Ct. 266, 84 L.Ed. 307 (1939); United States v. Castellana, 488 F.2d 65 (5th Cir. 1974); Reed v. Roylston, 22 Ariz.App. 118, 524 P. 2d 513 (1974). The question of whether statements made by the defendant at the police station later that morning are also barred as the "fruit" of the illegal custodial interrogation need not be determined as I conclude below they are inadmissible on other grounds.

## VOLUNTARINESS

The second issue concerning which I strongly disagree with the majority's conclusion is the question of whether statements made by the defendant after Officer Adams read the Miranda rights were voluntarily made. In summary fashion the majority notes that Taylor was a member of a minority group, came from a fatherless poverty-level home, had an eighth grade education, functioned at the borderline level of intelligence, and was questioned at one time or another during the night and early morning hours by eight police officers and one fire department official.

Admitting that "the questioning was long," the majority is somehow "impressed by the fact that despite this alleged overwhelming atmosphere, the appellant never confessed to anything," but rather "continued through an ever-changing pattern of fabrications to protest his innocence * * *." I fail to see how the end product of police interrogation relates to the issue of whether statements were voluntarily given.

The weakness in the majority's rationale is further highlighted by their reliance on People v. Lara, supra, where the California Supreme Court was supposedly "in the same position." In fact, the cases are dissimilar in several key respects. In Lara, the interrogation was not conducted during the late night and early morning hours, or by relays of experienced police officers, or stretched over a seven hour period. The defendant in Lara displayed a high degree of sophistication in bargaining with his interrogators. In addition, the California Court noted that the trial took place before Miranda and commented that "the standards there laid down are not controlling." Rather than finding "ourselves in the same position" as the court in Lara, the only significant similarities seem to be that both cases involved a juvenile defendant with subnormal intelligence.

The majority concludes that an "examination of the record convinces us that Taylor's statements were voluntarily made." A survey of the record brings me to the opposite conclusion.

The determination whether a waiver of rights is voluntary and intelligently made

by a juvenile is a fact question dependent upon the "totality of the circumstances." [4]

The United States Supreme Court has commented that application of principles excluding the use of involuntary statements by a minor "involves close scrutiny of the facts of individual cases." [5] Gallegos v. Colorado, 370 U.S. 49, 82 S.Ct. 1209, 8 L.Ed.2d 325 (1962). Instruction that the court's analysis of the facts should be particularly thorough is provided by In Re Gault, 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed. 2d 527 (1967):

" * * * the constitutional privilege against self-incrimination is applicable in the case of juveniles as it is with respect to adults. We appreciate that special problems may arise with respect to waiver of the privilege by or on behalf of children, and that there may well be some differences in technique—but not in principle—depending upon the age of the child and the presence and competence of parents. * * * *If counsel*

*was not present for some permissible reason when an admission was obtained, the greatest care must be taken to assure that the admission was voluntary, in the sense not only that it was not coerced or suggested, but also that it was not the product of ignorance of rights or of adolescent fantasy, fright or despair."* (Emphasis added.) 387 U.S. at 55, 87 S. Ct. at 1458, 18 L.Ed.2d at 561.

Courts are continually grappling with the question of "voluntariness," yet no single definition has been agreed upon. I agree with the following:

" * * * a confession [or statement] is not deemed to be voluntary merely because it represents a conscious choice among alternatives. On the other hand, it cannot be said that a statement is voluntary only if it would have been made even if no inquiry or other action by law enforcement officials had occurred. Rather, a 'confession is voluntary if it is the product of an essentially free and un-

4. The vast majority of jurisdictions utilize this test: Alaska: Schade v. State, 512 P.2d 907 (Alaska 1973); California: People v. Lara, 67 Cal.2d 365, 62 Cal.Rptr. 586, 432 P.2d 202 (1967), cert. denied 392 U.S. 945, 88 S.Ct. 2303, 20 L.Ed.2d 1407 (1968); Connecticut: State v. Oliver, 160 Conn. 85, 273 A.2d 867 (1970), cert. denied 402 U.S. 946, 91 S.Ct. 1637, 29 L.Ed.2d 115 (1971); Illinois: People v. Pierre, 114 Ill.App.2d 283, 252 N.E.2d 706 (1969), cert. denied 400 U.S. 854, 91 S.Ct. 71, 27 L.Ed.2d 92 (1970); Louisiana: State v. Melanson, 259 So.2d 609 (La.App.1972); Massachusetts: Commonwealth v. Cain, 279 N.E.2d 706 (Mass.1972); Minnesota: State v. Hogan, 297 Minn. 430, 212 N.W.2d 664 (1973); North Carolina: State v. Dawson, 278 N.C. 351, 180 S.E.2d 140 (1971); New York: People v. Stephen J. B., 23 N.Y.2d 611, 298 N.Y.S.2d 489, 246 N.E.2d 344 (1969); New Jersey: State v. R. W., 115 N.J.Super. 286, 279 A.2d 709 (1971); Ohio: State v. Carder, 3 Ohio App.2d 381, 210 N.E. 2d 714 (1965); Oregon: Nunn v. Cupp, 15 Or.App. 212, 515 P.2d 421 (1973); Pennsylvania: Commonwealth v. Moses, 446 Pa. 350, 287 A.2d 131 (1971); Tennessee: Vaughn v. State, 3 Tenn.Cr.App. 54, 456 S.W. 2d 879 (1970); Texas: In re Garcia, 443 S.W.2d 594 (Tex.Civ.App.1969); Washington: State v. Grant, 9 Wash.App. 260, 511 P.2d 1013 (1973); Wisconsin: Theriault v.

State, 66 Wis.2d 33, 223 N.W.2d 850 (1974); Wyoming: Mullin v. State, 505 P.2d 305 (Wyo.1973), cert. denied 414 U.S. 940, 94 S.Ct. 245, 38 L.Ed.2d 166.

Most federal courts are in accord: United States v. Poole, 161 U.S.App.D.C. 289, 495 F.2d 115 (1974); United States v. Miller, 453 F.2d 634 (4th Cir. 1972), cert. denied 406 U.S. 923, 92 S.Ct. 1790, 32 L.Ed.2d 123; Rivers v. United States, 400 F.2d 935 (5th Cir. 1968); West v. United States, 399 F.2d 467 (5th Cir. 1968), cert. denied 393 U.S. 1102, 89 S.Ct. 903, 21 L.Ed.2d 795 (1969); United States v. Harden, 480 F.2d 649 (8th Cir. 1973); United States v. Hilliker, 436 F.2d 101 (9th Cir. 1970), cert. denied, 401 U.S. 958, 91 S.Ct. 987, 28 L.Ed.2d 242 (1971).

See Theriault v. State, supra, at n. 11–12.

5. The court in Gallegos also stated "[t]here is no guide to the decision of cases such as this, except the *totality of circumstances* that bear on the two factors we have mentioned [procedural due process and compulsion]." (Emphasis added.) 370 U.S. at 55, 82 S.Ct. at 1213, 8 L.Ed.2d at 329.

See Boulden v. Holman, 394 U.S. 478, 89 S.Ct. 1138, 22 L.Ed.2d 433 (1969); Fikes v. Alabama, 352 U.S. 191, 77 S.Ct. 281, 1 L.Ed. 2d 246 (1957).

constrained choice and involuntary if the product of a will overborne.'" United States ex rel. Sanney v. Montanye, 364 F.Supp. 905, at 911 (W.D.N.Y.1973). See Schneckloth v. Bustamonte, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973); Townsend v. Sain, 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963).

The atmosphere at the Pioneer Hotel soon after outbreak of the fire was discovered can be described as one of panic. The record indicates several guests were forced to jump to their deaths before helpless would-be rescuers were able to coordinate their efforts and control the fast-spreading fire. There is significant evidence to indicate the defendant took part in these rescue efforts, helping to evacuate third floor guests and carrying several injured persons downstairs to waiting ambulances. Taylor testified he made approximately fifteen trips between the third floor and lobby levels.

As I previously concluded, the defendant was taken into custody by Officer Adams on the street in front of the Pioneer Hotel at approximately 2:41 a. m. Taylor testified he was "tired" at that point. He was then taken to the jammed police station and told to wait in a coffee room, described as small as 10′ x 10′ with at least three to five officers.[6] The testimony of various witnesses indicates almost every detective in the department and an unusual number of uniformed officers were present at the station that morning because of the fire.[7] In this atmosphere Taylor was almost immediately approached by Sgt. Rossetti and asked "how he had occasion to be at the Pioneer Hotel." Taylor then launched into the first of what proved to be a series of unsuccessful attempts to divert suspicion to unknown Blacks, Mexicans, and Caucasions he allegedly had seen in the hotel.

The record is replete with disputes over key factors relating to voluntariness. Adams testified that after he read the departmental rights card Taylor did not request an attorney and stated "sure" he understood his rights and would answer the officer's questions. The defendant, on the other hand testified that he asked to make a telephone call and requested "a lawyer or something", but that both requests were ignored.

The defendant testified he first went to the second floor of the police station when escorted by an unknown officer after asking him if he could use a restroom. Taylor asserted that after using the restroom he asked this officer if he could make a telephone call and requested an attorney but, as with Adams previously, received no response.

Det. Gassaway testified that the second floor interview room was approximately 10′ x 10′ to 12′ x 12′ and that there were never more than two police officers and the defendant present in the room. The defendant alleges a total of eight or nine individuals interrogated him that morning. Gassaway stated Taylor exhibited occasional "hostility", but never seemed reluctant to talk. The detective testified that the defendant never asked to make a telephone call and never requested an attorney.[8]

6. Testimony given by Det. Gassaway at the voluntariness hearing and trial indicates there were eight to ten officers in the coffee room at 3:00 a. m. In testimony which is almost impossible to reconcile with that given by Adams, the detective stated he and Adams but not the defendant were present at that point.

7. Det. Murchek and Det. Gassaway testified they were called at home and told to come to the station because of the fire at 2:50 a. m. and 3:00 a. m. respectively.

A comparison of footnotes 6 and 7 shows Gassaway testified at different hearings that he was both called at home and arrived at the police station at 3:00 a. m. We do know that Sgt. Moore described the defendant in such a manner to Gassaway during the phone call that Taylor must have already arrived at the station. Thus the only thing we can be sure of is that the call was made after 2:44 a. m.

8. It is clear the police were exercising very tight control over the defendant. As an

The tension of the interrogation process exploded when Gassaway returned to the interview room about 4:15 a. m. (after talking with Scoggins) and accused Taylor of lying. Gassaway described the defendant as "irate and [he] began to curse· at me." The defendant wanted to know "Why you are picking on me." Gassaway acknowledged "he did cry at one point there during his anger when he was shouting at me." Taylor was accused at least twice of starting the fire. At the preliminary hearing the detective testified profanity was used "[b]y both of us."[9]

The record shows Gassaway to be a trained and skillful interrogator.[10] Intermittent outbursts were interlaced with methodical questioning on details. Strong language was mixed with an appeal to Taylor's sense of compassion:

"Q. When Gassaway screamed at you, do you remember what he said?

\* \* \* \* \* \*

"A. He hold me where did I—he said what did I, you know, I want to kill those people before, you know, Christmas.

"Q. Anything else?

"A. And he shouted to me that I was a liar and I was lying to him and stuff like that."

The defendant eventually told Gassaway "If he didn't believe me, you know, that I would be willing to take a lie detector test." Throughout the interview Taylor appears to have been helpless in his own confusion, frantically trying to extricate himself. Constantly on the defensive, the defendant was clearly being pressured for a confession.

Taylor asserted at the voluntariness hearing that he told several detectives, including Gassaway and Murchek, that he did not want to talk by telling them to "get off my back". Gassaway, on the other hand, testified Taylor merely said "I just wanted you off my back" in response to a query why he had lied to the detective.

The interrogation by Det. Angeley began around 5:40 a. m.—6:00 a. m.. The detective testified Taylor appeared "somewhat agitated" during the interview. Taylor testified he told Angeley, like Gassaway, to "get off my back." Angeley testified inconsistently as to whether he actually accused the defendant of starting the fire, but admitted he did not believe what Taylor was saying. This interview, like the others, is the subject of conflicting evidence.[11] The defendant testified he requested an attorney during the interrogation. Angeley denies this. The detective testified "sometime after daylight" Taylor stated "when am I going to get to go home?" At the conclusion of the interview the defendant asked to notify his mother and was allowed to make two telephone calls: "\* \* \* I called twice and that's all they let me do, you know. They say you have got to go."

Det. Angeley dialed both times and testified the calls were two different numbers, and that only the second call was answered. Taylor testified, however, that both calls were to the same number and on both

---

example, during the first portion of the interview, between 3:30 a. m. and 3:55 a. m., the defendant was granted his request to use the drinking fountain and restroom. Det. Murchek testified he escorted Taylor to the drinking fountain because "I didn't know if he knew where it was." This sounds dubious as testimony indicated it was also on the second floor and easy to find. Moreover, Murchek stated he accompanied the defendant into the restroom, yet could not remember whether he himself used the facilities. The police were unwilling to let Taylor out of their immediate presence.

9. At the trial, however, Gassaway denied ever testifying he used profanity during the interrogation. He acknowledged merely raising his voice on two occasions.

10. When Gassaway was in the interview room he was in command. Murchek asked very few questions.

11. The substance of what was said during the various interrogations is a matter of great dispute. The conflict is being considered in this discussion, however, only insofar as it relates to the issue of voluntariness.

occasions Caudelle Neal, one of his mother's neighbors, answered the phone. This was confirmed by Mrs. Neal who testified she received two calls from Taylor early in the morning on December 20th. Det. Angeley testified the defendant told the person who answered the second call "I am at the Detective Division. [pause] They think I set the fire at the hotel. [pause] Tell her, no, I will be home in a little bit, no don't tell her, I will be home in a little bit." The defendant and Mrs. Neal do not dispute the accuracy of this testimony, but do contradict Angeley by asserting that in addition to the above a request was made over the phone for an attorney. Angeley testified he was within hearing distance and heard no such request. Mrs. Neal testified that the defendant stated "Mrs. Neal, I did not do it" and sounded like "a scared young boy. * * * Like he was frightened, scared, didn't know what was going to happen from one minute to the next."

Angeley testified he conducted all or almost all of the interrogation with just he and the defendant in the second floor interview room. However, at least one other detective participated since Captain Gilmore testified at the transfer hearing that as he entered the interview room between 6:30 a. m. and 7:00 a. m. Det. Angeley and another detective were just leaving.

Officer Scoopmire, who administered the polygraph exam at 7:15 a. m., testified at the transfer hearing that Taylor "asked me on more than one occasion if he was going to be allowed to go home after the examination." The officer responded he "wasn't in the position to make that decision." The defendant was escorted by Scoopmire and Officer Sulzbach back to the same second floor interview room.

Between 8:00 a. m. and 9:00 a. m. the defendant remained in that room and the questioning continued. Det. Smith testified "[t]here were other detectives talking to him" but was unable to remember their names or the number of interrogations. The detective testified he entered the interview room at 9:00 a. m. and immediately read the departmental rights card. The defendant allegedly responded that he understood his rights and agreed to answer questions.

Upon arrival at the Pima County Juvenile Court Center the defendant was informed of his rights by the receiving officer, Gerald Soop, who testified "[h]e advised me that he wanted a lawyer as soon as I advised him." Taylor, whom Soop described as "nervous", was also informed for the first time that he could be remanded for trial as an adult.

Confusing evidence indicates that just before or just after this, probably the latter, Det. Smith took the defendant to an interview room at the Center and advised him of his rights. Taylor at that point stated he understood his rights and wanted the assistance of an attorney. Undaunted the detective proceeded to conduct a ten minute interview. Just how unwilling the police were to relent in pressuring for some sort of admission by Taylor is demonstrated by the appearance of Officer Kohlman and Sgt. Bunting at the Juvenile Center the following day, despite their probable knowledge that the defendant had previously requested a lawyer.

The record fails to disclose a single police officer involved in the series of interrogations that was not aware the defendant was a juvenile. Despite this at no time before Taylor was transported to the Juvenile Center on the morning of December 20th did the police attempt to contact the defendant's mother. Without judging the credibility of the defendant's assertion that he asked two or three officers besides Angeley at the station if he could make a phone call, it certainly is relevant to the question of voluntariness that the first independent effort by the police to contact Taylor's mother was when Det. Smith attempted to call her at 10:00 a. m. from the Juvenile Center. This inaction by the police is especially troublesome because Det. Angeley knew exactly where the defendant's mother lived and, in fact, had been there on several occasions. Det. Murchek

testified he asked Sgt. Moore at approximately 4:30—4:45 a. m. whether Taylor's parents had been notified. The sergeant allegedly replied he would "check into it," but for unknown reasons nothing was done.

Not one officer at the station that morning informed the defendant he could be remanded for trial as an adult. While Taylor's prior contact with the law and the fact he recalled being informed he could be tried as an adult in connection with prior incidents is obviously a counter-balancing factor, it is also clear from the record that the defendant had never been involved in a transfer hearing.

Commencing with the second half of the Gassaway interview, at 4:15 a. m., a concerted effort was launched by the police to seek an admission by Taylor that he had started the fire at the Pioneer Hotel. The interrogation process became accusatory and vehement in nature. Gassaway and the defendant were screaming and cursing at each other. Series of police officers subsequently entered the interview room armed with the knowledge prior interrogators had gleaned from their sessions. This barrage was directed at the defendant despite the fact that at the time of these interviews no independent evidence existed that arson was the cause of the fire. It is uncontroverted that the defendant never even hinted he was in any way responsible for the tragedy.

The record discloses what I conclude to be a juvenile suddenly confronted with the overwhelming machinery of law enforcement who gradually disintegrates from a state of fright to a feeling of despair and frustration. He was emotionally unable to cope with the seasoned skills of his opponents in debate on his opponent's home ground.[12] It would be extremely difficult for a juvenile, even one who had prior encounters with the police, to conceive that it might be in his best interests to remain silent when under suspicion for the murder of more than a dozen people.[13] When confronted with the slightest incriminating evidence in a case such as this a youth would instinctively feel compelled to establish an alibi, whether guilty or not, lacking the maturity to understand "constitutional rights." A juvenile's natural inability to understand the significance of his "rights" would be compounded by the existence of an unusually low level of education[14] and subnormal intelligence,[15] such as the defendant's. The alleged voluntariness of any waiver is further questioned when the interrogations are conducted in the dead of night by relays of experienced police officers.[16]

Some indication of Taylor's state of mind during these interrogations is pro-

12. "Even innocent questions asked of a suspect in the inherently coercive atmosphere of the police station may create in him the impression that he must answer them." Proctor v. United States, 131 U.S.App.D.C. 241, 404 F.2d 819 (1968).

13. The seriousness of the crime with which a juvenile stands accused and the possible consequences it threatens are factors to be considered when analyzing the "totality of circumstances" surrounding an allegedly voluntary waiver of the privilege against self-incrimination.

14. See Payne v. Arkansas, 356 U.S. 560, 78 S.Ct. 844, 2 L.Ed.2d 975 (1958); Moore v. Michigan, 355 U.S. 155, 78 S.Ct. 191, 2 L.Ed. 2d 167 (1957); Story v. State, 452 P.2d 822 (Okl.Cr.1969).

15. "[I]f the minor is mentally retarded or of subnormal intelligence for his age, * * * that is a factor weighing heavily against a finding of capacity [to waive one's rights] * * * [although] the 'totality of circumstances' test still applies." People v. Lara, 67 Cal.2d 365, at 385, 62 Cal.Rptr. 586, at 600, 432 P.2d 202, at 216 (1967), cert. denied 392 U.S. 945, 88 S.Ct. 2303, 20 L.Ed.2d 1407 (1968). See Fikes v. Alabama, 352 U.S. 191, 77 S.Ct. 281, 1 L.Ed.2d 246 (1957); United States v. Blocker, 354 F.Supp. 1195 (D.C.D.C.1973).

16. The individuals who interrogated the defendant were all experienced officers in the Tucson Police Department: Adams, 4 years; Rossetti, 9 years; Gassaway, 8 years; Murchek, 9½ years; Angeley, 9½ years; and Smith 3 years.

vided by the fact that almost everything the defendant said was inconsistent with something he had previously stated, sometimes only seconds before. In his naivete the defendant's overriding concern was when he was going to be allowed to go home. The defendant in this case was questioned almost continuously by *at least* eight different police officers and one fire department official for almost *seven* hours through the night and early hours of the morning, from approximately 2:45 a. m. until 9:40 a. m. Even without the additional considerations of the time of day during which questioning was conducted, a low level of education, subnormal intelligence and coercive conduct by the police, any alleged waiver by a juvenile in the absence of counsel or parents during questioning of that duration should be suspect.[17]

When considering the admissibility of a juvenile's confession in Haley v. Ohio, 332 U.S. 596, 68 S.Ct. 302, 92 L.Ed. 224 (1948), the United States Supreme Court made the following comments which I consider particularly appropriate in the instant case:

"What transpired would make us pause for careful inquiry if a mature man were involved. And when, as here, a mere child—an easy victim of the law —is before us, special care in scrutinizing the record must be used. Age 15 is a tender and difficult age for a boy of any race. He cannot be judged by the more exacting standards of maturity. That which would leave a man cold and unimpressed can overawe and overwhelm a lad in his early teens. This is the period of great instability which the crisis of adolescence produces. A 15-year old lad, questioned through the dead·of night by relays of police, is a ready victim of the inquisition. Mature men might stand the ordeal from· midnight to 5 a. m.

But we cannot believe a lad of tender years is a match for the police in such a contest. He needs counsel and support if he is not to become the victim first of fear, then of panic. He needs someone on whom to lean lest the overpowering presence of the law, as he knows it, may not crush him. No friend stood at the side of this 15-year old boy as the police, working in relays, questioned him hour after hour, from midnight until dawn." 332 U.S. at 599–600, 68 S.Ct. at 303–04, 92 L.Ed. at 228–29.

The court also determined that the fact the juvenile defendant was informed of his constitutional rights does not necessarily establish the voluntariness of subsequent statements:

"The age of petitioner, the hours when he was grilled, the duration of his quizzing, the fact that he had no friend or counsel to advise him, the callous attitude of the police towards his rights combine to convince us that this was a confession wrung from a child by means which the law should not sanction. Neither man nor child can be allowed to stand condemned by methods which flout constitutional requirements of due process of law.

"But we are told that this boy was advised of his constitutional rights before he signed the confession and that, knowing them, he nevertheless confessed. That assumes, however, that a boy of fifteen, without aid of counsel, would have a full appreciation of that advice and that on the facts of this record he had a freedom of choice. We cannot indulge those assumptions. Moreover, we cannot give any weight to recitals which merely formalize constitutional requirements. Formulas of respect for consti-

---

17. All courts agree that lengthy interrogation, repeated and prolonged questioning and the lack of sleep or food are factors bearing on voluntariness. See Reck v. Pate, 367 U.S. 433, 81 S.Ct. 1541, 6 L.Ed.2d 948 (1961); Ashcraft v. Tennessee, 322 U.S. 143, 64 S.Ct. 921, 88 L.Ed. 1192 (1944); Chambers v. Florida, 309 U.S. 227, 60 S.Ct. 472, 84 L.Ed. 716 (1940).

In this case the defendant was up all night and was never offered anything to eat by the police.

tutional safeguards cannot prevail over the facts of life which contradict them. They may not become a cloak for inquisitorial practices and make an empty form of the due process of law for which free men fought and died to obtain." 332 U.S. at 600–01, 68 S.Ct. at 304, 92 L.Ed. at 229. See Gallegos v. Colorado, 370 U.S. 49, 82 S.Ct. 1209, 8 L.Ed.2d 325 (1962).

Any advantage Taylor might be presumed to have over the juvenile in *Haley*, because of increased age, 16 years, eight months old as compared to approximately 15 years old, would be more than compensated for by Taylor's subnormal intelligence and lack of education.

I have concluded on the basis of the "totality of circumstances" present in this case that statements made by the defendant after Gassaway re-entered the interview room after talking to Scoggins were "the product of a will overborne" by a coercive environment and coercive conduct by law enforcement personnel in violation of Taylor's Fifth, Sixth, and Fourteenth Amendment rights. This determination in no way represents acceptance on my part of the defendant's version of what occurred at the Tuscon Police Station the morning of December 20th.

The events of the fire and its aftermath, horrible as they undoubtedly are, are not sufficient to nullify that calm and judicial determination of the rights of an individual to a fair trial, let alone a juvenile of the mental capacity of the defendant, even if the law enforcement officers believed that he was guilty of causing the holocaust. The case should be decided rather on the observance of those constitutional principles guaranteed to all persons. The majority's failure to recognize this ominously encourages the sort of police misconduct and disregard for juvenile rights that occurred in this case.

I would, therefore, reverse the conviction and remand this case for a new trial.